Community College of Delaware County and Community College of Delaware County Authority, Appellants, and Township of Marple, Intervening Appellant, *v.* Mrs. Cyril G. Fox and Natural Lands Trust, Inc., Appellees.

Central Delaware County Authority, Appellant, *v.* Mrs. Cyril G. Fox and Natural Lands Trust, Inc., Appellees.

336

Argued December 4, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*D. Barry Gibbons,* with him *George P. Noel,* and *Gibbons, Buckley* and *Smith,* for appellants, Community College of Delaware County and Community College of Delaware County Authority.

*Herbert Goldfeld,* with him *Goldfeld & Friedman,* for intervening appellant.

*Robert J. Sugarman,* with him *William A. White, Warren Vogel,* and *Dechert, Price & Rhoads,* for appellees.

*William H. Markus,* with him *Markus, Riethmuller & Smith,* for amicus curiae, Pennsylvania Municipal Authorities Association.

*William M. Eichbaum,* General Counsel, with him *Douglas R. Blazey,* Assistant Attorney General, for amicus curiae, Commonwealth of Pennsylvania, Department of Environmental Resources.

*Fronefield Crawford, Jr.,* with him *Crawford & Diamond,* for amici curiae, Tri-County Conservancy of the Brandywine, Inc., Pennypack Watershed Association, Chester-Ridley-Crum Watershed Association, Del-Ches-Co Regional Council.

Opinion by Judge Blatt, July 18, 1975:

This action arises out of an appeal by Mrs. Cyril G. Fox and the Natural Lands Trust, Inc. (hereinafter Mrs. Fox and Natural Lands), from the grant of a sewage permit to the Central Delaware County Authority (Authority) by the Department of Environmental Resources (DER). Mrs. Fox and Natural Lands directed their appeal to the Environmental Hearing Board (EHB), which vacated the permit and remanded the matter to the DER. The Authority and the Community College of Delaware County (College) have now appealed to this Court from the two successive EHB adjudications.

The sewage permit issued by the DER allowed the Authority to run a twenty-four inch diameter sewer extension (24-inch interceptor) for a distance of approximately 7,500 feet along a stream known as Crum Creek, from a point where this extension intercepts a currently existing thirty-inch line on Crum Creek northwesterly to an unnamed tributary of Crum Creek (tributary). From that point the permit allowed the authority to run an eight-inch diameter extension (8-inch interceptor) for a distance of approximately 4,400 feet northerly along the tributary to the Marple Township Campus of the College. To the west of the intersection of the interceptors is situated a large dam across Crum Creek behind which lie the waters of the Springton Reservoir, a public water supply. To the west of the reservoir is a state park, and to the north of the reservoir is land which is largely undeveloped. The property owned by Mrs. Fox and Natural Lands lies east of the reservoir at the intersection of the two sewer interceptors. The College Campus lies north of this property and east of the undeveloped tract.

The 24-inch interceptor provides a flow capacity of 1,500,000 gallons per day, ten percent of which would be used to serve the College through the 8-inch interceptor. This would leave, of course, a 1,350,000 gallon per day reserve capacity for other unspecified purposes. It is this reserve capacity which gives rise to the controversy here involved.

In their appeal to the EHB, Mrs. Fox and Natural Lands asserted that the DER should not have issued the permit to the Authority without analyzing the long-range and indirect environmental impact of the construction of the sewer lines.[1] Such analysis was mandated, they

---

1. Mrs. Fox and Natural Lands have *not* appealed the EHB's determination that the immediate effects of constructing the sewer line, such as siltation during the construction period, and the possibility of leaks and overflows once the lines are constructed, will result in a negligible environmental impact.

argued, by The Clean Streams Law[2] and by the Pennsylvania Sewage Facilities Act[3] as both must be construed now in the light of Article I, Section 27 of the Pennsylvania Constitution, the Environmental Rights Amendment (hereinafter Section 27). During the pendency of the appeal to the EHB, construction was suspended by an EHB order of supersedeas. Then, on the basis of the evidence taken at the supersedeas hearing along with depositions taken subsequently, the EHB in two successive adjudications ruled that the DER, as Mrs. Fox and Natural Lands had argued, was in error in that it had not adequately considered environmental impact.

Focusing upon the issues raised in the appeal from the DER adjudication, the EHB made the following pertinent findings of fact:

"8. The provision of the sewer interceptor, with 1,350,000 gpd reserve capacity, would tend to induce and/or accelerate development in the area capable of being served by the interceptor, namely the area in the watershed of the Unnamed Tributary to Crum Creek where the Community College Campus is located and in the undeveloped portion of the Crum Creek watershed tributary to Springton Reservoir in Marple and Newton Townships. This area is now undeveloped largely because of the non-provision of public sewerage services; the soil is unsuitable for on-lot sewage treatment facilities.

"9. Such induced and/or accelerated development is likely to produce erosion and siltation effects, as well as other potential water pollution effects, on downstream areas, including Springton Reservoir and the Fox-Natural Lands Trust property, unless safe-

2. Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §691.1 et seq.

3. Act of January 24, 1966, P.L. (1965) 1535, *as amended*, 35 P.S. §750.1 et seq. (Supp. 1974-1975).

guards are provided prior to development. No adequate safeguards have been provided.

"10. The Department did consider the issue of indirect pollutional effects, but concluded that the Department's recently adopted Erosion and Sedimentation Control Regulations, 25 Pa. Code Chapter 102, provided an adequate safeguard. They do not.

\* \* \* \*

"12. Development induced and/or accelerated by construction of the interceptor in question would destroy the option to preserve all or part of the area of Crum Creek and its various tributaries upstream from the Fox-Natural Land Trust property as regional open space, recreational land, and/or natural areas.

"13. The Department did not consider the possibility that any portion of these lands might be, or perhaps should be, retained as regional open space, recreational or natural areas, nor did it consider issues relating to the pace, nature, or intensity or development in the area that could be served by the interceptor. Nor did it look to see whether any municipal and/or regional planning had been done to deal with these issues.

"14. The lands in question are logical—indeed choice—lands to be considered for use as regional open space recreational or natural areas. The area is now largely undeveloped, and is adjacent to the east of Ridley Creek State Park. If it were ever desired to expand Ridley Creek State Park, or to provide ancillary County or Regional Parks, this would be a logical area in which to do so.

"15. None of the relevant municipal or regional plans considered the alternative of regional open space, recreational or natural area use for the lands in question. Nor did they consider issues relating to the pace, nature, or intensity of development. They

all simply assumed that development without considering the desirability, nature, pace, or intensity of that development, would take place."

It is clear, of course, that when proceeding under either The Clean Streams Law or the Sewage Facilities Act, the DER must operate within the limitations of Article I, Section 27 of the Pennsylvania Constitution, which provides:

"*Natural Resources and the Public Estate*

"The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

The first sentence of this Section grants to the public a right to the described environmental values, while the second and third sentences establish the Commonwealth as trustee of all public natural resources. Here, however, because we have held that Section 27 is self-executing,[4] the EHB ruled that when the DER issues a sewage permit (or, perhaps, when it takes any other action within its legislative authority) Section 27 also requires the DER to determine that the municipal planning process has considered or, in the alternative, requires that the DER itself consider:

(1) the direct impact upon each of the environmental values listed in the first sentence of Section 27;

---

4. *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 8 Pa. Commonwealth Ct. 231, 302 A.2d 886 (1973); *accord, Department of Environmental Resources v. Pennsylvania Public Utility Commission*, 18 Pa. Commonwealth Ct. 558, 335 A.2d 860 (1975); *Payne v. Kassab*, 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973). We thus dispose of the initial argument, by the appellant herein, that Article I, Section 27 is not self-executing.

(2) the long-range indirect impact on these values, due to possible increased development or other secondary results of action;

(3) alternate methods of using the resource in question; and

(4) alternate methods of attaining the objective sought by a permit applicant.[5]

Because the EHB found that the DER and all municipal planning agencies here concerned had failed to evaluate adequately the considerations listed above, the sewage permit issued to the authority was vacated and the action was remanded to the DER for further studies in accordance with the EHB adjudications.

## STANDING

With this background in mind, we will now consider the argument on appeal to this Court by the Authority and the College, who assert first that Mrs. Fox and Natural Lands were not individually or together a "person aggrieved" by the DER issuance of the permit and, therefore, that they did not possess the standing necessary to challenge its issuance in their appeal to the EHB. We believe, however, that they had the necessary standing, although not for the reasons assigned by the EHB.

As we said in *Committee To Preserve Mill Creek v. Secretary of Health*, 3 Pa. Commonwealth Ct. 200, 281 A.2d 468 (1971), a litigant must meet the "person aggrieved" standard in order to have standing to challenge the action of an administrative agency through an *appeal* procedure. In its opinion here, the EHB seems to have rejected this rule as a requirement for standing in situations where an appeal is asserted to challenge the action of the DER as a violation of its duties as a trustee of

---

5. Although not listed in this fashion by the EHB adjudication, these four considerations are designated by the EHB as the minimum elements to which the DER must give attention in order to meet Section 27 requirements.

the public natural resources under Section 27. The EHB's opinion would appear to broaden the privilege of challenge to an action of this administrative agency by appeal in a case such as this so as to include litigants such as Mrs. Fox and Natural Lands who might not traditionally be considered aggrieved under some prior decisions. We must hold it in error for so doing, for we believe that, in any administrative appeal, a party must still be a "person aggrieved" by the adjudication in order to appeal from it. We do not rule that a more broad standard might not apply to standing in an *original action* as a direct challenge to an administrative agency for a violation of its duties as trustee of public natural resources.[6] But here the challenge is being made, not directly by means of an original action against the agency but on appeal from an agency decision to the EHB and then, of course, to this Court for review. And the challengers in an appeal must clearly be persons aggrieved.

To be aggrieved a person must have a direct interest in the action appealed from. *Louden Hill Farm, Inc. v. Milk Control Commission,* 420 Pa. 548, 217 A.2d 735 (1966) ; *Committee To Preserve Mill Creek, supra.* In *Committee To Preserve Mill Creek,* we stated: "We believe that it [the General Assembly] intended that such persons should have the right of hearing before the Secretary and this Court *where they allege that a permit has been granted not in accordance with official standards."* 3 Pa. Commonwealth Ct. at 207, 281 A.2d at 472. (Emphasis in original.) The official standards, of course, are those guidelines established by the General Assembly under the applicable statutes as such may be modified by any other standards which the United States and Pennsylvania Constitutions may require. In this case, Mrs. Fox and Natural Lands asserted that the permit

---

6. *See,* for example, *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973).

was not granted in accordance with official standards, but these were standards which had not heretofore been applied in the consideration of such permit applications, and, as will be indicated later, we do not consider them applicable.

As we review the evidence, however, Mrs. Fox and Natural Lands were nevertheless "persons aggrieved" by the DER adjudication. Bearing on this issue, the EHB found that:

"3.   Appellants reside on and/or own land on both sides of Crum Creek, immediately east of the Springton Reservoir Dam. Mrs. Fox owns a present interest in said land, and Natural Lands Trust, Inc., a future interest in said land. The Unnamed Tributary flowing from the Community College Campus joins Crum Creek on their land. The proposed sewer interceptor would cross their land.

"4.   A portion of the Fox-Natural Lands Trust property is used for wildlife refuge.

"5.   Siltation and/or other pollution of Crum Creek, and/or the Unnamed Tributary joining Crum Creek on the Fox-Natural Lands Trust land, is likely to have a detrimental effect on the use of that land as a wildlife refuge, as well as on the use of that land for other residential and/or associated recreational purposes."

It is clear in the record that the Fox and Natural Lands property is downstream from the Crum Creek watershed and that the proposed interceptor will cross it. And, while we do not believe that the evidence sufficiently supports the fourth finding that a portion of the Fox and Natural Lands property is used as a wildlife refuge, it does seem clear that the property actually is now used for recreational purposes such as fishing and picnicking. It is likely, therefore, to be adversely affected by any siltation or pollution which might result from the extension of the sewer line upstream, and, because of its close

proximity to the undeveloped land upstream, this property and its users are likely to be directly affected by any development which might take place there because of the future availability of sewer services to that area. It seems clear, therefore, that, although the EHB applied the wrong yardstick here, Mrs. Fox and Natural Lands do have standing to appeal from the issuance of the sewer permit by the DER. *Committee To Preserve Mill Creek v. Secretary of Health,* 3 Pa. Commonwealth Ct. 200, 281 A.2d 468 (1971).

## STANDARDS

This brings us to the merits of the next argument by the Authority and the College that the EHB erred in vacating the DER permit. They contend that the prescribed constitutional and statutory standards were met and that the DER, therefore, properly issued the permit, which the EHB should not have vacated.

In *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 29-30, 312 A.2d 86, 94 (1973) we held that:

"Section 27 was intended to allow the normal development of property in the Commonwealth, while at the same time constitutionally affixing a public trust concept to the management of public natural resources of Pennsylvania. The result of our holding is a controlled development of resources rather than no development.

"We must recognize, as a corollary of such a conclusion, that decision makers will be faced with the constant and difficult task of weighing conflicting environmental and social concerns in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources.

"Judicial review of the endless decisions that will result from such a balancing of environmental and

social concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources: (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?"

In *Payne,* the plaintiffs brought an equitable action within the original jurisdiction of this Court to enjoin the Commonwealth from enlarging a highway, an activity which the plaintiffs alleged violated their rights under Section 27 and constituted a breach of the Commonwealth's duties as trustee under Section 27. Here, of course, the EHB has held that the DER did not fulfill its duties as trustee under Section 27, and it was proper for the EHB to have assumed that the threefold standard that we adopted in *Payne* in an original action directly challenging the propriety of actions taken by the trustee applied as well to actions which are challenged on appeal from administrative adjudications.[7] *Department of Environmental Resources v. Public Utility Commission,* 18 Pa. Commonwealth Ct. 558, 335 A.2d 860 (1975).

---

7. As will become apparent from subsequent discussion, the extent to which an appellant as an aggrieved person may challenge DER action is limited by the specific statutory authority under which the appeal is taken. Herein lies the distinction between appeals and original actions, for, in an original proceeding, the extent to which a plaintiff may challenge an action of the DER would be limited only by the allegations of the complaint which might be sufficiently broad so as to include violations beyond the specific statutory provision under which that action was taken. It is obvious that the complete legislative mandate of the DER is far more extensive than the mandate under which isolated actions may be taken.

The EHB, in applying the *Payne* standards here, however, chose to elaborate upon those standards insofar as they apply to DER action on sewer permit applications. According to the EHB, the *Payne* standards require that the record before the DER in sewer permit cases must demonstrate that the agency has itself considered, or has determined that at least some municipal planning process has considered, four additional factors not enumerated in *Payne*, namely:

(1)   the direct impact upon each of the environmental values listed in the first sentence of Section 27;

(2)   the long-range indirect impact on these values, due to possible increased development or other secondary results of action;

(3)   alternate methods of using the resources in question; and

(4)   alternate methods of attaining the objective sought by a permit applicant.

Without determining whether or not the EHB has the power in its adjudicatory capacity to impose new standards upon the DER, we will consider whether or not the standards here imposed by the EHB may justifiably be imposed within our previous ruling in *Payne*.

Under the *Payne* test, of course, we must first evaluate the statutes applicable to the proceeding, and in this action the EHB has cited portions of both The Clean Streams Law and the Sewage Facilities Act. We will, therefore, quote from these statutes at some length to convey as fully as possible the purposes for which the General Assembly enacted them.

The Clean Streams Law in Sections 4 and 5, 35 P.S. §§691.4, 691.5 (Supp. 1974-1975) provides:

Section 4.

*"Declaration of policy*

"(1)   Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;

"(2)  Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;

"(3)  *It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, uppolluted condition every stream in Pennsylvania that is presently polluted;*

"(4)  The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

"(5)  The achievement of the objective herein set forth requires a comprehensive program of watershed management and control." (Emphasis added.)
Section 5.

*"Powers and duties*

"(a)  The board and the department, in adopting rules and regulations in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, **in the** exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in Section 4 of this act, consider, where applicable, the following:

"(1)  Water quality management and pollution control in the watershed as a whole;

"(2)  The present and possible future uses of particular waters;

"(3)  The feasibility of combined or joint treatment facilities;

"(4)  The state of scientific and technological knowledge;

"(5)  The immediate and long-range economic impact upon the Commonwealth and its citizens."
Obviously, it is incumbent upon the DER under this legislation to control and eliminate water pollution in a manner consistent with technology, community economy, feasibility of treatment, and the uses of the waters.

The Sewage Facilities Act in Section 5, 35 P.S. §750.5 (Supp. 1974-1975) provides:

"*Official plans*

"(a)   Each municipality shall submit to the department an officially adopted plan for sewerage systems serving areas within its jurisdiction within such reasonable period as the department may prescribe, and shall from time to time submit revisions of such plan as may be necessary.

. . . .

"(d)   Every official plan shall:

"(1)   *Provide for the orderly extension of community interceptor sewers* in a manner consistent with the needs and plans of the whole area, provided that this section shall not be construed to limit the development of such community facilities at an accelerated rate different than that set forth in the official plan;

. . . .

"(3)   *Take into consideration all aspects of planning, zoning,* population estimates, engineering and economics so as to delineate with all practicable precision those portions of the area which community systems may reasonably be expected to serve within ten years, after ten years, and any areas in which the provision of such services is not reasonably foreseeable;

"(4)   Take into consideration any existing State plan affecting the development, use and protection of water resources;

. . . .

"(7)   Be reviewed by appropriate official planning agencies within a municipality, including a planning agency with areawide jurisdiction if one exists, for consistency with programs of planning for the area, and all such reviews shall be transmitted to the department with the proposed plans; and

"(8) Include provision for periodic revision of the plan.

"(e) The department is hereby authorized to approve or disapprove official plans for sewerage systems submitted in accordance with this act within one year of date of submission." (Emphasis added.)

Certainly a broad reading and interpretation of these provisions would give some support to the notion that the four environmental considerations added by the EHB might fit within the DER's statutory mandate and thus fall within our holding in *Payne*.

It must be remembered, however, that the power of an administrative agency must be sculptured precisely so that its operational figure strictly resembles its legislative model. *Elias v. Environmental Hearing Board*, 10 Pa. Commonwealth Ct. 489, 312 A.2d 486 (1973) ; *Zamantakis v. Pennsylvania Human Relations Commission*, 10 Pa. Commonwealth Ct. 107, 308 A.2d 612 (1973). Thus, under the Sewage Facilities Act, the DER is entrusted with the responsibility to approve or disapprove official plans for sewage systems submitted by municipalities, but, while those plans must consider all aspects of planning, zoning and other factors of local, regional, and statewide concern, it is not a proper function of the DER to secondguess the propriety of decisions properly made by individual local agencies in the areas of planning, zoning and such other concerns of local agencies, even though they obviously may be related to the plans approved. Moreover, impropriety related to matters determined by those agencies is the proper subject for an appeal from or a direct challenge to the actions of those agencies as the law provides, not for an indirect challenge through the DER. As we read the Sewage Facilities Act, the function of the DER is merely to insure that proposed sewage systems are in conformity with local planning and consistent with statewide supervision of water quality management; it is the local

government agencies, who are responsible for planning, zoning and other such functions.

We need not, however, be further concerned with the construction of the Sewage Facilities Act, for we observe that the appeal which was filed by Mrs. Fox and Natural Lands with the EHB from the DER issuance of the sewer permit falls, as a matter of law, only within the provisions of The Clean Streams Law, and we note that Section 207 of The Clean Streams Law, 35 P.S. §691.207 requires merely that a permit be issued by the DER before a municipality shall be permitted to extend its sewer lines. The issuance of such a permit, of course, was the subject of the DER action here. The Sewage Facilities Act, on the other hand, requires permits where an individual or community sewage disposal system is to be installed or where any building is to be erected for which such a system is to be installed. Not only is this not the situation here, but the DER issued no such permit. This is obviously not an appeal from DER approval of the official sewerage facilities plan of Delaware County[8] and, therefore, the Sewage Facilities Act was not involved here. The EHB, however, seems none the less to have been following the language of the Sewage Facilities Act, and while it may be true that, based upon a well framed complaint in an original action alleging a breach by the DER of its fiduciary duties under Section 27, such language might offer persuasive evidence of the DER's fiduciary responsibilities, this is an *appeal* from action under another statute, and such considerations are not appropriate here.

In the present appeal, The Clean Streams Law is the only relevant statute which we must scrutinize under the threefold *Payne* test and the clear objective of The Clean Streams Law is to maintain and restore the

---

8. The extension of sewer lines into the area here in question is contemplated by the official planning process, indeed it is even considered as currently existing under the finally approved plan.

streams and other waters of the Commonwealth to an unpolluted condition. It is water pollution which The Clean Streams Law was intended to control and eliminate. *See, Commonwealth v. Barnes and Tucker Company*, 455 Pa. 392, 319 A.2d 871 (1974). Thus, the five criteria designated in Section 5(a) of The Clean Streams Law, which the DER must consider to insure implementation of this objective when issuing a permit, involve only such matters as relate to the possible pollution of Commonwealth waters. Such pollution would include, of course, siltation during the construction process, leakage and overflows during the use of the sewer interceptor, and uncontrollable erosion and sedimentation occurring as the secondary consequence[9] of the presence of the sewer interceptor. The EHB concluded here, however, that the actual construction and continued use of the sewer lines themselves would have no more than a negligible direct effect upon the water quality. It was the secondary consequences which the EHB considered to have been insufficiently controlled.

One can speculate forever, of course, upon possible secondary pollutional effects, but we must hold that for such secondary effects to preclude DER action, they must be more than merely speculative. They must be such conditions as will almost certainly occur as a result of the action taken, and conditions such that current law and technology provide *no* reasonable means to control them. Because of the reserve capacity of the interceptors, the EHB concluded that construction would *tend* to induce development of the watershed which would be *likely* to produce erosion and siltation as a secondary consequence of issuing the instant sewer permit. The EHB further

---

9. Secondary consequence here is meant to describe only those consequences which depend upon the operation of an intervening activity or force which may or may not be likely to take place. In this case the activity is the development of hitherto undeveloped land, the consequence is possible pollution resulting therefrom.

concluded that current erosion and sedimentation regulations do not provide sufficient safeguards to protect against these indirect pollutional activities to warrant DER reliance on them to achieve its legislative objective.

The EHB conclusion as to these indirect effects is, of course, no more certain than the words "tend to" and "likely to" can suggest. And, as we review the testimony of the witnesses in the record, we are inclined to agree with the EHB that a possibility exists that these activities will take place. We must differ, however, with the EHB conclusion that current regulations would not apply to protect against these effects if they actually should become imminent. Control of accelerated erosion and resulting sedimentation is established by the DER regulations under 25 Pa. Code §102 which seem to us to afford ample protection. We note the EHB conclusion that, based upon 25 Pa. Code §102.31(a)(4), such controls would apply only to development in parcels of 25 acres or more thereby not guarding against pollutional effects which might result here if development in smaller parcels takes place. As we read that provision, however, it relates merely to requirements for permits, providing that any development of 25 acres or more requires a permit. With regard to controls, however, 25 Pa. Code §102.4 provides that: "*All* earth-moving activities within this Commonwealth shall be conducted in such a way as to prevent accelerated erosion and the resulting sedimentation [and must be undertaken in conformity with a proper erosion and sedimentation control plan.]" (Emphasis added.) Control measures and regulations are clearly required, therefore, even in those development activities where permits are not necessary, and safeguards are clearly available to protect against possible adverse secondary erosion and sedimentation effects in the watershed. The DER, in issuing the sewer permit here, properly complied with the Clean Streams Law insofar as the direct and indirect *pollutional* effects have been considered.

The EHB, however, went beyond evaluation of mere pollutional concerns and arrived at more far-reaching conclusions concerning Section 5(a)(1), (2) and (5) of The Clean Streams Law, 35 P.S. §691.5(a)(1), (2) and (5).[10] It held that, under these provisions, the DER must consider alternate methods of using the resource in question and alternate methods of achieving the objectives sought by the applicant for a permit. Such considerations, the EHB said, would include the question "of possibly preserving open space, and recreational uses of particular waters, to be considered as balanced against potential [or accelerated] development of a particular watershed." Here we believe that the EHB has reached a much broader interpretation of the law than was intended by the General Assembly in its enactment.

As to the consideration of watershed management as a whole along with the consideration of present and possible future uses of waters under Sections 5(a)(1) and 5(a)(2), we believe that these requirements merely mandate the DER to provide effective pollutional control to meet the needs of watershed management in view of present and possible future uses of waters. We cannot say, as did the EHB, that the DER should evaluate local planning decisions or decide for itself what the best present and future uses of a watershed might be. It is clearly not for the DER, under these sections of The Clean Streams Law, to withhold the issuance of a sewer permit where it independently determines that land

---

10. In issuing permits the DER must consider under Section 5(a)

(1) Water quality management and pollution control in the watershed as a whole;

(2) The present and possible future uses of particular waters;

.  .  .  .

(5) The immediate and long-range economic impact upon the Commonwealth and its citizens.

might be better planned as open or recreational space rather than for commercial or residential uses.[11] To meet its legislative objectives, the DER must consider and safeguard against the adverse pollutional impact upon the watershed and its uses from the present and possible future uses as now conceived. Such impact has been considered here, and water pollution safeguards are here found to be sufficiently well established so as to provide that the sewer extension will not result in an undue adverse pollutional effect in disregard of the appropriate provisions of The Clean Streams Law.

As to the consideration of economic impact under Section 5(a) (5), this was intended, we believe, to include only matters clearly financial in nature, as for example the impact a given action might have upon a local tax base, the level of industrial activity, or local employment. *See, Department of Environmental Resources v. Borough of Carlisle,* 16 Pa. Commonwealth Ct. 341, 330 A.2d 293 (1974). It was not intended, as claimed by the EHB, to include such broad economic considerations as the "opportunity cost"[12] of agency action or the cost to "human health and happiness." We must hold, therefore, that, because there is no evidence here that the DER has not properly considered economic impact as a financial concept, there does not appear to have been any failure to comply with Section 5(a) (5) of The Clean Streams Law.

---

11. As we mention later, if Section 27 does impose upon the trustee an obligation to consider the alternative that undeveloped land should remain as open space, the trustee is the Commonwealth, and the DER is not necessarily the only appropriate agency of the Commonwealth to take action.

12. "Opportunity cost" is apparently meant to mean cost in terms of opportunities or alternatives which may be forclosed as a result of taking any action. Here such cost is alleged to be the loss of the opportunity to maintain the undeveloped land as open space.

Inasmuch as no other sections of The Clean Streams Law were allegedly violated, therefore, it can be said that the DER issued the sewer permit in full compliance with that legislation. Moreover, because The Clean Streams Law is the only applicable statute here, the DER has consequently met the first of the *Payne* standards.

We will now examine, therefore, the additional non-statutory tests presented under the *Payne* standards.

As is clearly evident from our prior discussion, the record in this case demonstrates that the *immediate* environmental incursion which will result from the construction of the sewer interceptors will be kept to a minimum as is necessary under the second of the *Payne* standards.

It is also clear, from our own review of the record, that the benefits of the proposed sewer extension are substantial when viewed against the almost negligible direct environmental harm which will result from the sewer construction, a test required under the third of the *Payne* standards.

The EHB, however, visualizes a more remote environmental harm which it characterizes as "the permanent destruction of the option to permanently retain some or all of the area as open space," and it holds this to be one of the environmental incursions and harms to which the non-statutory *Payne* standards are directed. Although we respect the well considered concern of the EHB, we believe that it points to the wrong agency as the body to be held responsible for failure to consider this possible harm.

The language of Section 27, of course, does not specify what governmental agency or agencies may be responsible for the preservation of the natural scenic, historic and esthetic values enumerated therein, but it seems clear that many state and local governmental agencies doubtless share this responsibility. The legitimate public interest in keeping certain lands as open space obviously

requires that a proper determination of the use to which land shall be adapted must be made, but again this is clearly not a statutory function of the DER. On the contrary, we believe that such a determination clearly is within the statutory authority not of the DER but of the various boroughs, townships, counties, and cities of the Commonwealth pursuant to a long series of legislative enactments. Among these enactments is the Municipalities Planning Code[13] which specifically empowers the governing bodies of these governmental subdivisions to develop plans for land use and to zone or to regulate such uses. Another such enactment is the Eminent Domain Code[14] under which property may be taken and its owners may be compensated when it is condemned for a proper public purpose. These municipal agencies have the responsibility to apply the Section 27 mandate as they fulfill their respective roles in the planning and regulation of land use, and they, of course, are not only agents of the Commonwealth, too, but trustees of the public natural resources as well, just as certainly as is the DER.

As we stated in *Payne,* our standards were meant to be realistic and not merely legalistic applications of Section 27. It must also be remembered that, while Section 27 may impose an obligation upon the Commonwealth to consider the propriety of preserving land as open space, it cannot legally operate to expand the powers of a statutory agency, nor can it expand the statutory powers of the DER as a practical matter here. *Bruhin v. Commonwealth,* 14 Pa. Commonwealth Ct. 300, 320 A.2d 907 (1974). On the contrary, it could operate only to limit such powers as had been expressly delegated by proper enabling legislation. It is the local agencies, familiar with

13. Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §10101 et seq.

14. Act of April 27, 1925, P.L. 310, *as amended,* 26 P.S. §1 et seq.

local land use planning, which are best equipped with the expertise to make decisions on these matters. Furthermore, the construction of a sewer line with a reserve capacity sufficient to accommodate development on currently undeveloped land cannot of itself be deemed to be the cause of any development later occurring there merely because the option to develop that land has not been foreclosed. The DER, therefore, cannot be held responsible for violating its obligations under Section 27 because it has permitted the construction which it authorized here.

## CONCLUSION

We believe the record in this case to indicate that all of the *Payne* standards have been satisfied. The only environmental result from which any serious injury might result is the possible future loss of current open space to future residential and commercial development, which may be a remote consequence of the installation of the sewer lines. This, however, is not the type of harm which would justify the DER in now refusing a sewer construction permit, and, as to current pollution, of course, the EHB has clearly found that such would be kept to a minimum. We can find, therefore, neither an error of law nor an abuse of discretion by the DER in its issuance of this sewer permit to the Authority.

We would agree with the EHB that "some comprehensive planning is required of the trustee," but we simply cannot sustain the notion that Section 27 automatically designates and authorizes the DER either to act as sole trustee and do all such planning or to supervise and/or coordinate the planning responsibilities of local government agencies. Desirable as such supervision and/or coordination may be, neither Section 27 nor any pertinent legislation authorizes the DER to provide it.

We would earnestly hope for some legislative clarification of the questions suggested here, or even for appropriate Executive Board action where such is possi-

ble.[15] Until there is such clarification, however, we must hold that whenever and however the many agencies of the Commonwealth, state and local, share in the trusteeship responsibilities of Section 27, and however desirable some supervision and review of their efforts may be, the DER has not been designated and may not now function as the sole trustee, supervisor and/or coordinator of the Commonwealth's responsibilities as trustee under Section 27.

We, therefore, issue the following

ORDER

AND NOW, this 18th day of July, 1975, the adjudications of the Environmental Hearing Board in this matter are hereby reversed along with its order vacating the sewer permit previously issued by the Department of Environmental Resources, which permit is hereby ordered to be reinstated.

———

CONCURRING OPINION BY JUDGE MENCER:

Accepting, as I must, the only definitive appellate pronouncement on the issue of whether or not the provisions of Article I, Section 27 of the Pennsylvania Constitution are self-executing, which is set forth in *Commonwealth v. National Gettysburg Battlefield Tower, Inc.,* 8 Pa. Commonwealth Ct. 231, 302 A. 2d 886 (1973). I concur with Judge BLATT's thoughtful and well-reasoned opinion and in the result reached in this case.

———

15. Action recently taken by the Executive Board provides an example of the designation of responsibility by executive action. It ordered the Office of Historic Preservation in the Historical and Museum Commission to encourage and coordinate efforts to preserve Pennsylvania's historic and architectural resources. The order provides steps by which the preservation of historic resources may be assured and designates this agency as the one to which the public may look to assert its protectable historic interests.

Nevertheless, I hold firm to my view, as expressed in my dissent in *Commonwealth v. National Gettysburg Battlefield Tower, Inc., supra,* that the provisions of Article I, Section 27, are not self-executing.

---

CONCURRING OPINION BY PRESIDENT JUDGE BOWMAN:

Having previously expressed my disagreement with the majority view that the provisions of Article I, Section 27, are self-executing in *Department of Environmental Resources v. Pennsylvania Public Utility Commission,* 18 Pa. Commonwealth Ct. 558, 335 A.2d 860 (1975), and in *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973), I feel impelled to reiterate it here and until such time as our Supreme Court definitely resolves this issue.

Assuming Article I, Section 27, to be self-executing, it is my opinion, as I believe to be the opinion of the majority, that a particular department or agency of our State government enjoys the role of "trustee" of our natural resources and public estate strictly within the limits of the power and authority conferred upon that particular department or agency by the Legislature. Simply by invoking Article I, Section 27, neither it nor a third party can enlarge its "trustee" role beyond the parameters of its statutory power and authority.

I concur in the result.

JUDGE KRAMER joins in this concurring opinion.