Concerned Citizens for Orderly Progress et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources and Emerald Enterprises, Limited, Respondents.

Argued March 1, 1978, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Mencer, Rogers, Blatt and DiSalle.

*Robert J. Sugarman,* with him *Lois Reznick; Dechert, Price & Rhoads; Harold A. Lockwood, Jr.,* and, of counsel, *Alan B. McFall; Cassebaum & McFall,* P.C., for appellants.

*Thomas L. Walters* and *John P. Krill, Jr.*, with them, *Raymond J. DeRaymond; Coffin, DeRaymond, Shipman and Stitt;* and *Dennis J. Harnish,* Assistant Attorney General, for appellees.

PER CURIAM OPINION, June 21, 1978:

A citizen's organization, Concerned Citizens for Orderly Progress, affected landowners, Mary Sayer, Walter O. and Liesel Deichmann, and the Board of Supervisors of Upper Mt. Bethel Township (Appellants), petition for review of an order of the Environmental Hearing Board (Board), dated February 24, 1977, at Docket Nos. 76-106-W and 76-105-W, sustaining the action of the Department of Environmental Resources (DER), in issuing Water Quality Management Permit No. 4875402 (permit) to Emerald Enterprises, Inc. (Emerald).

The permit was originally issued by DER on July 21, 1975, and authorized construction and operation of sanitary sewers and a sewage treatment plant to serve an approved trailer park development. The effluent from this plant would be discharged into an unnamed tributary of the Allegheny Creek.[1] During periods of dry weather, primarily the months of April through September when the natural flow into the receiving stream may decrease, the effluent would be discharged across a bog area, through an overland flow feature, and would then enter the unnamed tributary. This overland flow feature, which entails passing the treated effluent through a perforated pipe, was included in the permit at the behest of DER. An appeal to the Board was taken from the issuance of this permit.

---

[1] The unnamed tributary flows into the Allegheny Creek, which in turn flows into the Delaware River approximately five miles downstream from its confluence with the tributary.

On February 11, 1976, the Board set aside the permit and ordered the DER to obtain more detailed information concerning the discharge area and required Emerald to design a procedure for monitoring the efficiency of the overland flow feature. Following compliance with these directives, the permit was reinstated by DER on July 8, 1976. An appeal from the reissuance of the permit was thereupon taken. On February 24, 1977, after a full hearing before the Board, the reissuance of the permit was sustained. This appeal followed.

Initially, we note that our scope of review of Board decisions is governed by Section 44 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended,* 71 P.S. §1710.44. Pursuant thereto, we must affirm the adjudication of the Board unless it is determined that Appellants' constitutional rights were violated, an error of law was committed, or any necessary finding of fact was not supported by substantial evidence. *East Pennsboro Township Authority v. Department of Environmental Resources,* 18 Pa. Commonwealth Ct. 58, 334 A.2d 798 (1975).

Appellants advance four major arguments in support of their proposition that the decision of the Board should be reversed and the permit revoked. They first contend that the issuance of the permit violated The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.1 et seq. Next, they challenge the Board's action permitting the unconditional use of the overland flow feature, an allegedly experimental treatment system. They further challenge the issuance of the permit for the reason that the Board refused to consider the potential for flooding of the proposed sewage plant. Finally, Appellants contend that the Board violated Article I, Section 27 of the Pennsylvania Constitution in sustaining the permit issuance

without a showing that appropriate evaluations of environmental effects were undertaken.

Prior to the issuance of a permit, the DER is statutorily required to consider those factors specified in Section 5(a)(1), (2), and (5) of The Clean Streams Law, 35 P.S. §691.5(a)(1), (2), and (5).[2] To assist in the implementation of this inquiry, the DER has promulgated certain regulations pertaining to the minimum water quality criteria for streams in our Commonwealth. When a permit application would affect waters having a better quality than the applicable water quality criteria, departmental regulations, found at 25 Pa. Code §95.1,[3] provide for more stringent

---

[2] Section 5 of The Clean Streams Law provides in pertinent part:

(a) The board and the department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

(1) Water quality management and pollution control in the watershed as a whole;

(2) The present and possible future uses of particular waters;

. . . .

(5) The immediate and long-range economic impact upon the Commonwealth and its citizens.

[3] 25 Pa. Code §95.1 provides, *inter alia*:

(b) Waters having a better quality than the applicable water quality criteria as of the effective date of the establishment of such criteria shall be maintained at such high quality unless it is affirmatively demonstrated that a change is justified as a result of necessary economic or social development and will not preclude uses presently possible in such waters.

(c) Any industrial, public or private project or development which would constitute a new source of pollution

requirements to be met. Appellants strenuously argue that the provisions applicable to high quality streams control the instant permit issuance. The failure of the Board to consider the non-degradation provisions of 25 Pa. Code §95.1 allegedly amounts to clear and reversible error. By implication it is suggested that if these provisions had been applied, it would be clear that the unnamed tributary would be degraded as a result of the permit issuance. The fallacy of this argument is Appellants' initial assumption that 25 Pa. Code §95.1 applied under the present circumstances. In this regard, the Board made the following Finding of Fact:

23. The April and June, 1976, tests concerning the quality of the unnamed tributary revealed that while the chemical quality of the stream is good, the biological quality of the stream is not, in that the amount of fecal coliform exceeds drinking water standards.

A review of the record indicates that there was evidence elicited at the hearings which would support these findings of fact. Appellants, moreover, did not present any test results of their own which would tend to contradict these findings. Given the lack of evidence which would suggest that the unnamed tributary has a better water quality than the applicable water quality criteria, we cannot conclude that the requirements of 25 Pa. Code §95.1(b) govern the instant case.

Alternatively, Appellants argue that even if 25 Pa. Code §95.1 does not control the present permit issuance, Sections 5(a)(2) and 5(a)(5) of The Clean Streams Law have not been complied with.

Section 5(a)(2) mandates consideration of the "present and possible future uses of particular wa-

---

or an increased source of pollution to high quality waters shall be required to provide the highest and best practicable means of waste treatment to maintain high water quality.

ters'' when issuing permits. It is claimed that the presence of the sewage treatment plant and the resulting effluent placed into the unnamed tributary would severely curtail the present recreational uses, impinge on the aesthetic enjoyment of the area, and damage aquatic biology. While it is true that some effects are bound to occur when the sewage plant is in operation, these effects will not be so deleterious as to require preclusion of the plant altogether. In the first place, Section 5(a)(2) does not mandate that there can be no changes in the present or possible future uses. It requires only that the effects of a permit issuance be evaluated in light of these uses. If, for example, the effects would be of such magnitude and of such a deleterious nature as to substantially and permanently foreclose present and possible future uses, then the propriety of issuing the permit should be severely questioned. In addition, the apparent effect the construction would have on present recreational uses, primarily those limited to hunting activities, and on the alleged damage to aquatic biology, given the permit restrictions imposed upon Emerald, will be negligible. Appellants point to the threat to the drinking water wells should the area be converted from a discharge area to a recharge area. This argument, framed in terms of possible future effects, is without merit. Based on testimony presented at the hearing, the Board found that the stream and the bog are natural discharge areas. We cannot determine otherwise.

Consideration must also be given, pursuant to Section 5(a)(5), to "[t]he immediate and long-range economic impact upon the Commonwealth and its citizens." Several reports and other documentary evidence relating to economic impact were submitted by Emerald. In addition, expert testimony on this aspect was elicited at the hearings. We cannot find that the Board failed to consider either the immediate or long-

range economic impact of the proposed sewage treatment plant.

This Court set forth certain standards in *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973), *aff'd,* 468 Pa. 226, 361 A.2d 263 (1976), which must be considered in passing on the propriety of a controlled development of our natural resources subject to Article I, Section 27 of the Constitution of Pennsylvania.[4] The third standard enunciated in *Payne* requires balancing the environmental harm against the benefits to determine whether permitting the application would be an abuse of discretion. The Board, however, refused to apply this standard based upon its interpretation of *Community College of Delaware County v. Fox,* 20 Pa. Commonwealth Ct. 335, 342 A.2d 468 (1975). The Board construed *Fox* to require that the Commonwealth refrain from balancing the benefits and harm of a project when local decisions are involved.

The Board has misunderstood the import of our decision in *Fox.* The DER's issuance of the sewage permit in *Fox* was approved since, among other reasons, "our own review of the record, [indicates] that the benefits of the proposed sewer extension are substantial when viewed against the almost negligible direct environmental harm which will result from the sewer construction. . . ." 20 Pa. Commonwealth Ct. at 357, 342 A.2d at 481. While it is the responsibility of local governmental agencies to deal with planning,

---

[4] Article I, Section 27 of the Pennsylvania Constitution states:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

zoning and other related functions, it is incumbent upon DER to insure that a proposed project is in conformity with local planning and consistent with statewide supervision of water quality management. Thus, the DER, as trustee of the Commonwealth's public natural resources by virtue of Article I, Section 27 of the Constitution of Pennsylvania, must address the direct impact of issuing such a permit.

Further clouding the resolution of this issue is Emerald's contention that the third standard enunciated in *Payne* should not be applied in the instant case since Emerald is a private developer. Specifically, Emerald argues that neither the DER nor the Board have the authority to require a private developer to prove benefits. The developer, however, is not required to prove benefits. It is the obligation of the agency or instrumentality of the Commonwealth involved to balance benefits against environmental damages, where an action of that instrumentality or agency might cause a diminution of Pennsylvania's public natural resources as set forth in Article I, Section 27.

The Board, in its adjudication, and the DER, in its brief, admit that the required balancing of social and economic benefits against environmental harm was not conducted in the instant case. While such an inquiry should have been undertaken, our own examination of the exhaustive record reveals that the environmental impact of the sewage plant and the resulting effluent will be negligible, while the social and economic benefits appear to be significant. In view of such a determination, we refrain from remanding this case to the Board since it would only unnecessarily lengthen the already protracted determination of the propriety of this permit.

We now turn to a consideration of the remaining requirements set forth in *Payne*. The first of the

*Payne* standards requires compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources. The Board in its adjudication found no clear violation of any pertinent statute, and we have particularly found no violation of The Clean Streams Law or any relevant regulation. Moreover, the Board stated that where there is no violation of The Clean Streams Law, then The Fish Law of 1959, Act of December 15, 1959, P.L. 1779, *as amended,* 30 P.S. §1 et seq., by virtue of the language of Section 200, 30 P.S. §200,[5] cannot supersede The Clean Streams Law, or restrict any permit issued thereunder. Appellants attack this interpretation and argue that the Board erred as a matter of law in concluding that The Fish Law of 1959 could be disregarded. The DER in its brief argues against the interpretation of the Board but also recognizes that another set of circumstances might better serve the resolution of this issue. We agree. The Board, in its Findings of Fact stated:

24. Only minimal uses of the unnamed tributary are being made since the present quality of the

---

[5] Section 200 of The Fish Law of 1959 provides:

No person shall put or place in any waters within or on the boundaries of this Commonwealth any electricity, explosives or any poisonous substances whatsoever for the purpose of catching, injuring or killing fish, except that, for the purpose of fish management, agents or persons authorized by the Commission under the supervision of the Executive Director may use any method or means of eradication or control of fish. No person shall allow any substance of any kind or charcter, deleterious, destructive or poisonous to fish, aquatic organisms, amphibians and reptiles, to be turned into or allowed to run, flow, wash or be emptied into any waters within this Commonwealth but nothing herein contained shall be deemed to repeal or supersede any of the provisions of the act of June 22, 1937, (P.L. 1987, No. 394), known as 'The Clean Streams Law.'

water fails to meet bathing or drinking standards and the unnamed tributary does not support any population of fishes.

Since The Fish Law of 1959 is not applicable where there is no population of fish to be protected, Section 200 cannot preclude the issuance of the permit in this instance.

The final question we must consider under *Payne* is whether the record demonstrates a reasonable effort to reduce the environmental incursion to a minimum. Appellants argue that the fatal flaw in this regard was the insufficiency of the tests that were conducted. Their argument is premised on what they consider omissions in information and lack of DER initiative to adequately investigate, question, or seek additional information, rather than attacking the accuracy of the information that was presented. We have already resolved the contention of whether the bog area would be converted into a recharge area. Appellants' arguments notwithstanding, there was sufficient data and testimony presented to determine that the area will remain a discharge area. Furthermore, Emerald is required to submit daily samples of the treated effluent to DER for the purposes of proving compliance with the requirements of the permit. In light of the voluminous, relevant, and adequate scientific data that was presented, we are unable to determine that the Board abused its discretion in finding that a reasonable effort had been made to ensure minimum environmental incursions.

Appellants would also have us decide that the Board erred in granting an unconditional permit to Emerald when, in their estimation, the overland flow feature is still an experimental system.[6] As previously

---

[6] The regulation governing experimental projects is found at 25 Pa. Code §91.25, where it is provided:

stated, however, this system was incorporated into the waste water system at the request of DER. It is Emerald's position that even if this system were not incorporated into the sewage treatment plant, the criteria established by the second permit would nevertheless be complied with. Expert testimony was presented that the overland flow feature was not experimental in nature. In the absence of convincing evidence to the contrary, which Appellants have failed to provide, this feature cannot be viewed as experimental. The issuance of an unconditional permit under these circumstances was justifiable.

The final substantive argument raised by Appellants concerns their challenge of the Board's determination that the possibility for flooding, if for some reason the impoundment on the property failed, was outside the scope of its adjudication. The reasons for not considering the potential for flooding are not given by the Board. However, there appears to be no Pennsylvania statute or department regulation which expressly prohibits the construction of a sewage treatment plant on land which is subject to flooding. *Commonwealth v. Beitman*, 67 Pa. D. & C. 2d 499, 504-05 (1974). Nevertheless, Appellants specifically argue that since no consideration was given to the flooding question other than a DER inquiry to Emerald relating to whether the project was in the 100 year flood plain, DER has violated its duty as trustee under the mandate of Article 1, Section 27. We do not agree. The potential for flooding in the present case is purely speculative. The evidence did not establish that the

---

If the suitability of a proposed device or method of treatment has not been demonstrated by actual field use, only conditional approval will be given to it until such time as the effectiveness of the device or treatment has been demonstrated to the satisfaction of the Department by ample field experience.

204

location is subject to flooding or clearly demonstrate that the plant is within the 100 year flood plain. This is not the case, as in *Commonwealth v. Beitman, supra,* where the Board found appellant had sufficiently alerted it to the problems which could arise by virtue of the decision to locate that sewage treatment plant on a site which was subject to flooding so that either the Authority or the DER had the duty to come forth with clear and concise evidence as to whether the decision was prudent.

We determine, therefore, that the adjudication by the Board sustaining the permit issuance to Emerald was proper, as no error of law was committed and all necessary findings of fact were supported by substantial evidence. Accordingly, we affirm.

ORDER

AND Now, this 21st day of June, 1978, the order of the Environmental Hearing Board, dated February 24, 1977, at Docket Numbers 76-106-W and 76-105-W, is affirmed.