**ROBINSON TOWNSHIP, Washington County, Pennsylvania, Brian Coppola, Individually and in His Official Capacity as Supervisor of Robinson Township, Township of Nockamixon, Bucks County, Pennsylvania, Township of South Fayette, Allegheny County, Pennsylvania, Peters Township, Washington County, Pennsylvania, David M. Ball, Individually and in His Official Capacity as Councilman of Peters Township, Township of Cecil, Washington County, Pennsylvania, Mount Pleasant Township, Wash-**

ington County, Pennsylvania, Borough of Yardley, Bucks County, Pennsylvania, Delaware Riverkeeper Network, Maya Van Rossum, the Delaware Riverkeeper, Mehernosh Khan, M.D., Petitioners

v.

COMMONWEALTH of Pennsylvania, Pennsylvania Public Utility Commission, Robert F. Powelson, in His Official Capacity as Chairman of the Public Utility Commission, Office of the Attorney General of Pennsylvania, Linda L. Kelly, in Her Official Capacity as Attorney General of the Commonwealth of Pennsylvania, Pennsylvania Department of Environmental Protection and Michael L. Krancer, in His Official Capacity as Secretary of the Department of Environmental Protection, Respondents.

Commonwealth Court of Pennsylvania.

Argued June 6, 2012.
Decided July 26, 2012.

Susan J. Kraham, New York, NY, John M. Smith, Canonsburg, and Jordan B. Yeager, Doylestown, for petitioners.

Howard G. Hopkirk, Senior Deputy Attorney General, Harrisburg, and Matthew H. Haverstick, Philadelphia, for respondents.

Walter A. Bunt, Jr., Pittsburgh, for amici curiae Penneco Oil Company, Inc., Chesapeake Appalachia, LLC, MarkWest Liberty Midstream & Resources, LLC, The Pennsylvania Independent Oil and Gas Association and The Marcellus Shale Coalition.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and SIMPSON, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY President Judge PELLEGRINI.[1]

Before this Court are preliminary objections filed by the Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission (Commission), et al.,[2] (collectively, the Commonwealth) in response to a petition for review filed by Robinson Township, et al.,[3] (collectively, Petitioners) challenging the constitutionality of Act 13.[4] Also before the Court is Petitioner's motion for summary relief seeking judgment in their favor.[5] The Commission and the DEP have filed a cross-motion for summary relief.

On March 29, 2012, Petitioners filed a petition for review in the nature of a complaint for declaratory judgment and injunctive relief in this Court's original jurisdiction challenging the constitutionality of Act 13 pertaining to Oil and Gas—Marcellus Shale.[6] Act 13 repealed Pennsylvania's Oil and Gas Act[7] and replaced it with a codified statutory framework regulating oil and gas operations in the Commonwealth. Among other provisions involving the levying and distribution of impact fees and the regulation of the operation of gas wells, Act 13 preempts local regulation,[8] including environmental laws and zoning code provisions except in limited instances regarding setbacks in certain areas involving oil and gas operations. "Oil and gas operations" are defined as:

> (1) well location assessment, including seismic operations, well site preparation,

---

1. While the majority of the *en banc* panel voted to grant Petitioners' Motion for Summary Relief regarding Counts I–III, because of a recusal, the vote of the remaining commissioned judges on those Counts resulted in a tie, requiring that this opinion be filed pursuant to Section 256(b) of the Internal Operating Procedures of the Commonwealth Court. 210Pa. Code § 67.29(b).

2. The other Respondents are: Robert F. Powelson, in his official capacity as Chairman of the Public Utility Commission; Office of the Attorney General of the Commonwealth of Pennsylvania; Linda L. Kelly, in her official capacity as Attorney General of the Commonwealth of Pennsylvania; Pennsylvania Department of Environmental Protection (DEP); and Michael L. Krancer, in his official capacity as Secretary of the Department of Environmental Protection.

3. The other Petitioners are: Washington County, Pennsylvania; Brian Coppola (Coppola), individually and in his Official Capacity as Supervisor of Robinson Township; Township of Nockamixon, Bucks County, Pennsylvania; Township of South Fayette, Allegheny County, Pennsylvania; Peters Township, Washington County, Pennsylvania; David M. Ball (Ball), individually and in his Official Capacity as Councilman of Peters Township; Township of Cecil, Washington County, Pennsylvania; Mount Pleasant Township, Washington County, Pennsylvania; Borough of

Yardley, Bucks County, Pennsylvania; Delaware Riverkeeper Network; Maya Van Rossum (Van Rossum), the Delaware Riverkeeper; and Mehernosh Khan, M.D. (Dr. Khan).

4. 58 Pa.C.S. §§ 2301–3504.

5. Petitioners originally filed a motion for summary judgment, which this Court by order dated May 10, 2012, deemed a motion for summary relief pursuant to Pa. R.A.P. 1532(b).

6. The petition is lengthy consisting of 108 pages and 14 counts: 12 counts requesting declaratory relief, one count requesting a preliminary injunction and another requesting a permanent injunction.

7. Act of December 19, 1984, P.L. 1140, *as amended,* formerly 58 P.S. §§ 601.101–601.605.

8. 58 Pa.C.S. § 3303 provides:

> Notwithstanding any other law to the contrary, environmental acts are of Statewide concern and, to the extent they regulate oil and gas operations, occupy the entire field of regulation, to the exclusion of all local ordinances. The Commonwealth by this section, preempts and supersedes the local regulation of oil and gas operations regulated by the environmental acts, as provided in this chapter.

construction, drilling, hydraulic fracturing and site restoration associated with an oil or gas well of any depth;

(2) water and other fluid storage or impoundment areas used exclusively for oil and gas operations;

(3) construction, installation, use, maintenance and repair of:

(i) oil and gas pipelines;

(ii) natural gas compressor stations; and

(iii) natural gas processing plants or facilities performing equivalent functions; and

(4) construction, installation, use, maintenance and repair of all equipment directly associated with activities specified in paragraphs (1), (2) and (3), to the extent that:

(i) the equipment is necessarily located at or immediately adjacent to a well site, impoundment area, oil and gas pipeline, natural gas compressor station or natural gas processing plant; and

(ii) the activities are authorized and permitted under the authority of a Federal or Commonwealth agency.

58 Pa.C.S. § 3301. Act 13 also gives the power of eminent domain to a corporation that is empowered to transport, sell or store natural gas, *see* 58 Pa.C.S. § 3241, and requires uniformity of local ordinances, 58 Pa.C.S. § 3304.

Petitioners allege that they have close to 150 unconventional [9] Marcellus Shale wells drilled within their borders, and Act 13 prevents them from fulfilling their constitutional and statutory obligations to protect the health, safety and welfare of their citizens, as well as public natural resources from the industrial activity of oil and gas drilling. Petitioners allege that Act 13 requires them to modify many of their zoning laws.[10]

In response to the passage of the Act, Petitioners filed a 12–count petition for review alleging that Act 13 violates:

---

9. An "unconventional well" is defined as "A bore hole drilled or being drilled for the purpose of or to be used for the production of natural gas from an unconventional formation." 58 Pa.C.S. § 3203.

10. The Commonwealth agrees that such modification will be necessary in order to promote statewide uniformity of ordinances. Its brief in support of the preliminary objections states that Act 13:

[I]s the General Assembly's considered response to the challenges of environmental protection and economic development that come with the commercial development of unconventional formations, geological formations that cannot be produced at economic flow rates or in economic volumes except by enhanced drilling and completion technologies. One of the most commonly known unconventional formations is the Marcellus Shale, a hydrocarbon-rich black shale formation that underlies approximately two-thirds of Pennsylvania and is believed to hold trillions of cubic feet of natural gas and is

typically encountered at depths of 5,000 to 9,000 feet.

Act 13 broadly rewrote Pennsylvania's Oil and Gas Act in an effort to, *inter alia,* modernize and bolster environmental protections in light of the increased drilling likely to occur throughout the Commonwealth as Marcellus Shale natural gas resources are tapped.... Act 13 also institutes an impact fee, which redistributes industry revenue to communities directly affected by Marcellus Shale operations (as well as to other Commonwealth entities involved in shale development). Finally, and perhaps most relevant to these Preliminary Objections, Act 13 fosters both environmental predictability and investment in the nascent shale industry by increasing statewide uniformity in local municipal ordinances that impact oil and natural gas operations.

(Commonwealth's memorandum of law in support of preliminary objections at 3–4) (footnotes omitted).

- Article 1 § 1 of the Pennsylvania Constitution and § 1 of the 14th Amendment to the U.S. Constitution as an improper exercise of the Commonwealth's police power that is not designed to protect the health, safety, morals and public welfare of the citizens of Pennsylvania; **(Count I)**

- Article 1 § 1 of the Pennsylvania Constitution because it allows for incompatible uses in like zoning districts in derogation of municipalities' comprehensive zoning plans and constitutes an unconstitutional use of zoning districts; **(Count II)**

- Article 1 § 1 of the Pennsylvania Constitution because it is impossible for municipalities to create new or to follow existing comprehensive plans, zoning ordinances or zoning districts that protect the health, safety, morals and welfare of citizens and to provide for orderly development of the community in violation of the MPC[11] resulting in an improper use of its police power; **(Count III)**

- Article 3 § 32 of the Pennsylvania Constitution because Act 13 is a "special law" that treats local governments differently and was enacted for the sole and unique benefit of the oil and gas industry; **(Count IV)**

- Article 1 §§ 1 and 10 of the Pennsylvania Constitution because it is an unconstitutional taking for private purposes and an improper exercise of the Commonwealth's eminent domain power; **(Count V)**

- Article 1 § 27 of the Pennsylvania Constitution because it denies municipalities the ability to carry out their constitutional obligation to protect public natural resources; **(Count VI)**

- the doctrine of Separation of Powers because it entrusts an Executive agency,

the Commission, with the power to render opinions regarding the constitutionality of Legislative enactments, infringing on a judicial function; **(Count VII)**

- Act 13 unconstitutionally delegates power to the Pennsylvania Department of Environmental Protection (DEP) without any definitive standards or authorizing language; **(Count VIII)**

- Act 13 is unconstitutionally vague because its setback provisions and requirements for municipalities fail to provide the necessary information regarding what actions of a municipality are prohibited; **(Count IX)**

- Act 13 is unconstitutionally vague because its timing and permitting requirements for municipalities fail to provide the necessary information regarding what actions of a municipality are prohibited; **(Count X)**

- Act 13 is an unconstitutional "special law" in violation of Article 3, § 32 of the Pennsylvania Constitution because it restricts health professionals' ability to disclose critical diagnostic information when dealing solely with information deemed proprietary by the natural gas industry while other industries under the *federal Occupational and Safety Act* have to list the toxicity of each chemical constituent that makes up the product and their adverse health effects; **(Count XI)** (Dr. Khan is the only petitioner bringing this claim.)

- Article 3, § 3 of the Pennsylvania Constitution prohibition against a "bill" having more than a single subject because restricting health professionals' ability to disclose critical diagnostic information is a different subject than the regulation of oil and gas operations; **(Count XII)**

11. The MPC refers to the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101–11202.

(Dr. Khan is the only petitioner bringing this claim) [12]

Petitioners' motion for summary relief echoes the allegations in the petition for review.[13]

In response to the petition for review, the Commonwealth has filed preliminary objections alleging that: (1) Petitioners lack standing to file their action; (2) Petitioners' claims are barred because they involve non-justiciable political questions; and (3) Counts I through XII fail to state claims upon which relief may be granted. Regarding Counts XIII and XIV, the Commonwealth alleges that Petitioners have not set forth a separate cause of action for granting relief and also fail to state claims upon which summary relief may be granted. It requests that we dismiss the petition for review and, necessarily, its motion for summary relief as well. The Commonwealth has also filed a cross-application for summary relief.

## I.

## STANDING

The Commonwealth contends that the seven municipalities (municipalities), the two councilmembers, the physician and the environmental association do not have standing to challenge the constitutionality of Act 13.

■ In simple terms, "standing to sue" is a legal concept assuring that the interest of the party who is suing is really and concretely at stake to a degree where he or she can properly bring an action before the court. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (stating that the "gist" of standing is whether the party suing alleged such a personal stake in the outcome of the controversy); 3 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE, § 14.10, at 387 (2d ed.1997). Pennsylvania has its own standing jurisprudence, although the doctrine of standing in this Commonwealth is recognized primarily as a doctrine of judicial restraint and not one having any basis in the Pennsylvania Constitution. *Housing Auth. of the Cty. of Chester v. Pa. State Civil Serv. Comm'n,* 556 Pa. 621, 730 A.2d 935 (1999).

■ Fundamentally, the standing requirement in Pennsylvania "is to protect against improper plaintiffs." *Application of Biester,* 487 Pa. 438, 442, 409 A.2d 848, 851 (1979). Unlike the federal courts, where a lack of standing is directly correlated to the ability of the court to maintain jurisdiction over the action, the test for standing in Pennsylvania is a flexible rule of law, perhaps because the lack of standing in Pennsylvania does not necessarily deprive the court of jurisdiction. *Compare*

---

**12.** Petitioners seek preliminary and permanent injunctive relief in **Counts XIII and XIV** respectively.

**13.** "The standard for summary relief is found at Pa. R.A.P. 1532(b) which is similar to the relief envisioned by the rules of civil procedure governing summary judgment. "After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law:
(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense

which could be established by additional discovery or expert report, or
(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury."
*Brittain v. Beard,* 601 Pa. 409, 417 n. 7, 974 A.2d 479, 484 n. 7 (2009).

*Jones Mem'l Baptist Church v. Brackeen,* 416 Pa. 599, 207 A.2d 861 (1965), *with Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). As a result, Pennsylvania courts are much more expansive in finding standing than their federal counterparts.

In *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 192, 346 A.2d 269, 281 (1975), where there was a challenge to the legality and the constitutionality of a parking tax, our Supreme Court extensively reviewed the law of standing and stated the general rule: A party has standing to sue if he or she has a "substantial, direct, and immediate interest" in the subject matter of the litigation. The elements of the substantial-direct-immediate test have been defined as follows:

A "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.

*S. Whitehall Twp. Police Serv. v. S. Whitehall Twp.,* 521 Pa. 82, 86–87, 555 A.2d 793, 795 (1989) (internal citations omitted).

Although the substantial-direct-immediate test is the general rule for determining the standing of a party before the court, there have been a number of cases that have granted standing to parties who otherwise failed to meet this test, including *William Penn.* In *William Penn,* our Supreme Court addressed, among other issues, the standing of parking lot owners to

challenge a parking tax imposed on patrons of their garages and lots. Even though the parking lot owners were not required to pay the challenged tax, our Supreme Court held that:

[T]he causal connection between the tax and the injury to the parking operators is sufficiently close to afford them standing under a statute, such as section 6, which is essentially neutral on the question. While the tax falls initially upon the patrons of the parking operators, it is levied upon the very transaction between them. Thus the effect of the tax upon their business is removed from the cause by only a single short step.

We find very persuasive authority for this conclusion in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 271 [571], 69 L.Ed. 1070 (1925), and *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). In *Pierce,* the operators of private schools were held to have standing to challenge a law which required parents to send their children to public schools. In *Truax,* an alien was held to have standing to challenge a law which forbade certain employers to employ aliens as more than 20% of their work force. In each case the regulation was directed to the conduct of persons other than the plaintiff. However, the fact that the regulation tended to prohibit or burden transactions between the plaintiff and those subject to the regulation sufficed to afford the plaintiff standing. While the burdens imposed in those cases may have been more onerous than that involved in this case (amounting to a total prohibition is *Pierce* ), that does not render the causal connection any less immediate.

*William Penn,* 464 Pa. at 208–09, 346 A.2d at 289. In *Philadelphia Facilities Management Corporation v. Biester,* 60 Pa. Cmwlth. 366, 431 A.2d 1123, 1131–1132

(1981), we explained that the United States Supreme Court set the criteria by which a party can challenge the legality and constitutionality of a statute on the putative rights of other persons or entities when "(1) the relationship of the litigant to the third party is such that the enjoyment of the right by the third party is inextricably bound with the activity the litigant seeks to pursue; *and* (2) there is some obstacle to the third party's assertion of his own right." *See also Consumer Party of Pa. v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986) (citing *Application of Biester*) (granting standing to a taxpayer challenging the constitutionality of a legislative pay raise).

This exception has been utilized by our courts to grant standing to taxpayers challenging a variety of governmental actions. For example, the courts have granted standing to taxpayers challenging judicial elections on the grounds that those elections were scheduled in a year contrary to that prescribed by the Pennsylvania Constitution, *Sprague v. Casey,* 520 Pa. 38, 550 A.2d 184 (1988); to the state bar association, Pennsylvania attorneys, taxpayers and electors challenging the placement of a proposed state constitutional amendment on the ballot, *Bergdoll v. Kane,* 557 Pa. 72, 731 A.2d 1261 (1999); and to a state senator challenging the governor's failure to submit nominations to the state senate within the constitutional period, *Zemprelli v. Thornburg,* 47 Pa.Cmwlth. 43, 407 A.2d 102 (1979). The theory underlying these cases is that public policy considerations favor a relaxed application of the substantial-direct-immediate test, particularly the "direct" element that requires the party bringing the action to have an interest that surpasses that of the common people. *Consumer Party.*

■ Finally, certain public officials have standing to represent the interest of the public both under their authority as representatives of the public interest and under the doctrine of *parens patriae.* The doctrine of *"parens patriae"* refers to the "ancient powers of guardianship over persons under disability and of protectorship of the public interest which were originally held by the Crown of England as 'father of the country,' and which as part of the common law devolved upon the states and federal government." *In re Milton Hershey School Trust,* 807 A.2d 324, 326 n. 1 (Pa.Cmwlth.2002) (quoting *In re Pruner's Estate,* 390 Pa. 529, 532, 136 A.2d 107, 109 (1957)) (citations omitted). *Under parens patriae* standing, the attorney general is asserting and protecting the interest of another, not that of the Commonwealth. For example, public officials have an interest as *parens patriae* in the life of an unemancipated minor. *Commonwealth v. Nixon,* 563 Pa. 425, 761 A.2d 1151 (2000). *See also DeFazio v. Civil Service Commission of Allegheny County,* 562 Pa. 431, 756 A.2d 1103 (2000) (the sheriff of a second-class county was found to have standing to enjoin the enforcement of legislation that regulated activities both in and out of the workplace because the sheriff had to terminate employees who violated the legislation unless the civil service commission agreed to a suspension of the employees).

### A.

### Standing of Municipalities

■ Regarding the seven municipalities who have brought this action, the Commonwealth argues that the petition for review is premised on the notion that Act 13 is unconstitutional because it impacts the rights of citizens; however, the municipalities have no standing to assert the claims of their citizens against the Commonwealth because Act 13 does not harm the municipalities themselves and the petition for review only addresses speculative

harms that may occur to the citizens. "The various Municipal Petitioners simply do not suffer any harm to their 'local government functions' if zoning is required and development allowed that allegedly harms the property and environmental rights of citizens of this Commonwealth. To the extent that such harms are 'permitted' by Act 13, which they are not, the appropriate citizens may have standing to bring such claims.... However, the Municipal Petitioners simply have no basis— no *standing*—to act as proxy parties for the appropriate litigants." (Commonwealth's Memorandum of Law in Support of Preliminary Objections at 9.) (Emphasis in original.)

The Petitioners, however, respond that Act 13 imposes substantial, direct and immediate obligations on them that will result in specific harms to their interests as governing entities, including adverse impacts that serve to affect their abilities to carry out their governmental functions, duties and responsibilities under Pennsylvania law. They explain that Act 13 imposes substantial, direct, immediate and affirmative obligations on them that affect their local government functions, including the requirement of modifying their zoning laws in ways that will make the ordinances unconstitutional.[14] Specifically, to implement the mandates of Act 13, the municipalities would be required to completely rewrite their zoning codes and pass new land-use ordinances that create special carve-outs for the oil and gas industry that are inconsistent with long-established mu-

nicipal comprehensive plans. Noteworthy, Act 13 provides Petitioners with 120 days to expend significant time, monies and resources to develop entirely new comprehensive plans and ordinances; consult with respective planning commissions and county planning commissions; submit formal copies of proposed ordinances to municipal and county planning commissions; submit the proposed ordinance to the Public Utility Commission for review; advertise public notice of public hearings; conduct public hearings; submit revised formal copies of proposed ordinances and publicly advertise for the passage and approve final ordinances and comprehensive plans.

To maintain standing to a constitutional challenge, the municipality must establish that its interest in the outcome of the challenge to a state law is: (1) substantial when aspects of the state law have particular application to local government functions (as opposed to general application to all citizens); (2) direct when the state law causes the alleged constitutional harm; and (3) sufficiently immediate when the municipality asserts factually supported interests that are not speculative or remote. *City of Philadelphia v. Commonwealth of Pennsylvania*, 575 Pa. 542, 561–63, 838 A.2d 566, 578–79 (2003) (holding that the City of Philadelphia had standing to challenge the constitutionality of a state law because "the City's present assertion that it is an aggrieved party is premised upon the effects of [the Act] upon its interests and functions as a governing entity, and not merely upon harm to its citizens.")

14. For example, Petitioners allege that they would have to: (a) modify their zoning laws in a manner that fails to give consideration to the character of the municipality, the needs of its citizens and the suitabilities and special nature of particular parts of the municipality, Section 603 of the MPC, 53 P.S. § 10603(a); (b) modify their zoning laws in a manner that would violate and contradict the goals and objectives of Petitioners' comprehensive plans, Section 605 of the MPC, 53 P.S. § 10605; and (c) modify zoning laws and create zoning districts that violate Petitioners' constitutional duties to only enact zoning ordinances that protect the health, safety, morals and welfare of the community, Section 604 of the MPC, 53 P.S. § 10604.

*See also Franklin Twp. v. Dep't of Envtl. Res.*, 500 Pa. 1, 452 A.2d 718 (1982) (township had standing because of its direct and substantial interest where the possibility of harm was immediate to the quality of life of its citizens); *William Penn*, 464 Pa. at 191, 346 A.2d at 280 (quoting *Man O'War Racing Ass'n, Inc. v. State Horse Racing Comm'n*, 433 Pa. 432, 441, 250 A.2d 172, 176–77 (1968)) (" 'The party must have a direct interest in the subject-matter of the particular litigation, otherwise he can have no standing to appeal. And not only must the party desiring to appeal have a direct interest in the particular question litigated, but his interest must be immediate and pecuniary, and not a remote consequence of the judgment. The interest must also be substantial.' ") A substantial interest is one in which there is some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law.

In this case, the municipalities have standing to bring this action because Act 13 imposes substantial, direct and immediate obligations on them that affect their government functions. Specifically, 58 Pa. C.S. § 3304 requires *uniformity of local ordinances* to allow for the reasonable development of oil and gas resources. That will require each municipality to take specific action and ensure its ordinance complies with Act 13 so that an owner or operator of an oil or gas operation can utilize the area permitted in the zoning district. If the municipalities do not take action to enact what they contend are unconstitutional amendments to their zoning ordinances, they will not be entitled to any impact fees to which they may otherwise be entitled and could be subject to actions brought by the gas operators. Because Act 13 requires that the municipalities enact zoning ordinances to comply with the provisions of Act 13, the municipalities have standing because Act 13 has a sub-

stantial, direct and immediate impact on the municipalities' obligations. Moreover, even if the interest of the litigant was not direct or immediate, the municipalities' claims that they are required to pass unconstitutional zoning amendments are inextricably bound with those of the property owners' rights whose property would be adversely affected by allowing oil and gas operations in all zoning districts as a permitted use when even the Commonwealth admits that property owners affected by such a permitted use would have standing to bring a challenge to the constitutionality of the Act 13.

### B.

### Standing of Council Members and Landowners

 The Commonwealth also contends that Coppola and Ball, who have sued as councilmembers of their respective municipalities and as a "citizen of the Commonwealth," have failed to allege any kind of significant interest and have not pled any interest, claim or harm of any kind in their individual capacities. Coppola and Ball allege that they are local elected officials acting in their official capacities representing their respective municipalities who could be subject to personal liability and who would be required to vote on the passage of zoning amendments to comply with Act 13. They are also residents of the townships in which they serve as local elected officials. As individual landowners and residents, they live in a district that has been zoned residential in which oil and gas operations are now permitted under Act 13. They will not be able to rely on the fact that their next-door neighbor will not use his or her property for an industrial activity that will serve to immediately devalue their properties. Coppola has provided an affidavit stating the same and

that his respective township has lost areas for future development by way of drilling in residential areas. Ball has provided an affidavit stating that Act 13 entirely denies him of the protections he relied upon regarding the value of his home and he is unable to guarantee to any prospective buyer that industrial applications will not exist in the residential area in the future. As local elected officials acting in their official capacities for their individual municipalities and being required to vote for zoning amendments they believe are unconstitutional, Coppola and Ball have standing to bring this action.

## C.

### Standing of Associations

■ As to the Delaware Riverkeeper Network, even in the absence of injury to itself, an association may have standing solely as the representative of its members and may initiate a cause of action if its members are suffering immediate or threatened injury as a result of the contested action. *Mech. Contractors Ass'n of E. Pa., Inc. v. Dep't of Educ.*, 860 A.2d 1145 (Pa.Cmwlth.2004); *Nat'l Solid Wastes Mgmt. Ass'n v. Casey*, 135 Pa. Cmwlth. 134, 580 A.2d 893 (1990). However, having not shown that at least one member has suffered or is threatened with suffering a "direct, immediate, and substantial injury to an interest as a result of

the challenged action," which is necessary for an association to have standing, *Energy Conservation Council of Pa. v. Public Util. Comm'n*, 995 A.2d 465, 476 (Pa.Cmwlth. 2010), the Delaware Riverkeeper Network lacks standing. *See also Sierra Club v. Hartman*, 529 Pa. 454, 605 A.2d 309 (1992) (holding that Sierra Club and various other environmental organizations that brought suit challenging the failure by the Legislature to adopt a proposed air pollution regulation lacked standing because their interest in upholding a constitutional right to clean air were no greater than the common interest of all citizens).

## D.

### Standing of Riverkeeper

■ This failure extends to Van Rossum, the Delaware Riverkeeper[15] who similarly fails to plead any direct and immediate interest, claim or harm. While she contends that she has performed numerous activities in relation to gas drilling issues in the Delaware River Basin, including data gathering, she also contends that her personal use and enjoyment of the Delaware River Basin will be negatively affected if gas drilling is authorized to proceed in these areas without the protections afforded by locally-enacted zoning ordinances. Her concern that truck traffic and air pollution will interfere with her

---

15. The petition for review states that Van Rossum is a full-time, privately funded ombudsman responsible for the protection of the waterways in the Delaware River Watershed. She advocates for the protection and restoration of the ecological, recreational, commercial and aesthetic qualities of the Delaware River, its tributaries and habitats. (Petition for Review (PFR) at ¶ 33.) Petitioners further explain that Delaware Riverkeeper Network (DRN) is "a non-profit organization established in 1988 to protect and restore the Delaware River, its associated watershed, tributaries and habitats." (PFR at ¶ 32.) "To

achieve these goals, DRN organizes and implements streambank restorations, a volunteer monitoring program, educational programs, environmental advocacy initiatives, recreational activities, and environmental law enforcement efforts throughout the entire Delaware River Basin watershed. DRN is a membership organization headquartered in Bristol, Pennsylvania, with more than 8,000 members with interests in the health and welfare of the Delaware River and its watershed. DRN brings this action on its own behalf and on behalf of its members, board and staff." (PFR at ¶ 32.)

enjoyment of the river or her work as ombudsman, however, does not rise to the level of a substantial, immediate and direct interest sufficient to confer standing.

### E.

### Standing of Medical Doctor

■ Finally, we turn to whether Dr. Khan has standing to challenge the constitutionality of Act 13 as being a "special law" in violation of Article 3, § 32 of the Pennsylvania Constitution because it treats the oil and gas industry differently than other industries regarding the disclosure of critical diagnostic information and as having more than a single subject in violation Article 3, § 3 of the Pennsylvania Constitution because it deals with both the health care of patients and a different subject, the regulation of oil and gas operations.

58 Pa.C.S. § 3222.1(b)(10) and (b)(11), titled "Hydraulic fracturing chemical disclosure requirements," regarding hydraulic fracturing of unconventional wells performed on or after the date of the Act, provides that the following are required disclosures:

> (10) A vendor, service company or operator shall identify the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information to any health professional who requests the information in writing if the health professional executes a confidentiality agreement and provides a written statement of need for the information indicating all of the following:
>
> (i) The information is needed for the purpose of diagnosis or treatment of an individual.
>
> (ii) The individual being diagnosed or treated may have been exposed to a hazardous chemical.

> (iii) Knowledge of information will assist in the diagnosis or treatment of an individual.
>
> (11) If a health professional determines that a medical emergency exists and the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information are necessary for emergency treatment, the vendor, service provider or operator shall immediately disclose the information to the health professional upon a verbal acknowledgment by the health professional that the information may not be used for purposes other than the health needs asserted and that the health professional shall maintain the information as confidential. The vendor, service provider or operator may request, and the health professional shall provide upon request, a written statement of need and a confidentiality agreement from the health professional as soon as circumstances permit, in conformance with regulations promulgated under this chapter.

Under these two sections of Act 13, upon request from a health professional, information regarding any chemicals related to hydraulic fracturing of unconventional wells shall be provided by the vendor.

Dr. Kahn's only predicate for his interest in Act 13 is that "he treats patients in an area that *may likely* come into contact with oil and gas operations." (*See* PFR at ¶ 35.) Petitioners contend that this gives him a direct, substantial and immediate interest in this controversy because it affects his ability to effectively treat his patients. They explain that Dr. Khan is a medical doctor and resident of the Commonwealth and operates a family practice in Monroeville, Allegheny County, where he treats patients in an area that may likely come into contact with oil and gas operations. Because the claim that 58 Pa.

C.S. § 3222.1(b)(10) and (b)(11) restricts health professionals' ability to disclose critical diagnostic information when dealing with information deemed proprietary by the natural gas industry, it requires him to disregard general ethical duties and affirmative regulatory and statutory obligations and to hide information they have gained solely because it was produced by an industry favored by the General Assembly. (Petitioner's brief in opposition to Commonwealth's preliminary objections at 57.)

While keeping confidential what chemicals are being placed in the waters of the Commonwealth may have an effect, both psychologically and physically, on persons who live near or adjacent to oil and gas operations to where these chemicals may migrate both psychologically and physically, his standing to maintain the constitutional claims is based on his claim that the confidentiality restrictions may well affect his ability to practice medicine and to diagnose patients. However, until he has requested the information which he believes is needed to provide medical care to his patients and that information is not supplied or supplied with such restrictions that he is unable to provide proper medical care, the possibility that he may not have the information needed to provide care is not sufficient to give him standing. *See National Rifle Association v. City of Philadelphia,* 977 A.2d 78 (Pa.Cmwlth.2009) (plaintiffs did not have standing to bring a claim that their rights under Article I, § 21 of the Pennsylvania Constitution that the "right of the citizens to bear arms in defence of themselves and the State shall not be questioned" were infringed by an ordinance requiring that stolen guns had to be reported to the police until the plain-

tiffs' guns were stolen or lost). *See also National Rifle Association v. City of Pittsburgh,* 999 A.2d 1256, (Pa.Cmwlth.2010); *Commonwealth v. Ciccola,* 894 A.2d 744 (Pa.Super.2006), *appeal denied,* 591 Pa. 660, 916 A.2d 630 (2007); and *Commonwealth v. Semuta,* 902 A.2d 1254 (Pa.Super.2006), *appeal denied,* 594 Pa. 679, 932 A.2d 1288 (2007).(no standing to object to the constitutionality of a statute unless the party is affected by the particular feature alleged to be in conflict with the constitution). Of course, once the composition of the chemicals placed in the Commonwealth's water is disclosed to him, if Dr. Kahn believes that the chemicals in the water cause a generalized health hazard that would affect the health, safety and welfare of the community, he would have standing to challenge the confidentiality provisions, even if he has signed the confidentiality agreement.

Accordingly, because he does not have standing, Counts XI and XII of the Petition for Review are dismissed.

## II.

## JUSTICIABILITY

 The Commonwealth also preliminarily objects to the petition for review on the basis that Petitioners' claims are barred because they involve non-justiciable political questions. "The power to determine how to exercise the Commonwealth's police powers, including how to best manage Pennsylvania's natural resources and how to best protect its citizens, is vested in the Legislature." (Commonwealth's preliminary objections at 3.) It argues that Art. 1, § 27 of the Pennsylvania Constitution [16] provides that the Commonwealth is

---

16. Art. 1, § 27 of the Pennsylvania Constitution provides:

**Natural resources and the public estate.**

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of

the trustee of Pennsylvania's natural resources and it shall conserve and maintain them for the benefit of all the people. That provision provides the Legislature with the authority to determine the best way to manage the development of Pennsylvania's oil and gas resources while protecting the environment. If Petitioners are unhappy with the changes the Legislature has made in enacting Act 13, they should proceed through the political process and not ask this Court to nullify policy determinations that were made pursuant to the Constitution and for which there are no manageable standards for the judiciary to assess the merit of the determinations made by the Legislature.

▆▆ The political question doctrine is derived from the separation of powers principle. *Pa. Sch. Bds. Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs*, 569 Pa. 436, 451, 805 A.2d 476, 484–485 (2002). A basic precept of our form of government is that the Executive, the Legislature and the Judiciary are independent, co-equal branches of government. *Id.* at 451, 805 A.2d at 485. Although the ordinary exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers, there are certain powers constitutionally conferred upon the legislative branch that are not subject to judicial review. *Id.* A challenge to the Legislature's exercise of a power that the Constitution commits exclusively to the Legislature presents a non-justiciable political question. *Id.*

Under the Commonwealth's reasoning, any action that the General Assembly would take under the police power would not be subject to a constitutional challenge. For example, if the General Assembly decided under the police power that to prevent crime, no one was allowed to own any kind of gun, the courts would be precluded to hear a challenge that the Act is unconstitutional under Art. 1, § 21 of the Pennsylvania Constitution, which provides, "The right of the citizens to bear arms in defence of themselves and the State shall not be questioned." Nothing in this case involves making a determination that would intrude upon a legislative determination or, for that matter, require the General Assembly to enact any legislation to implement any potential adverse order; what we are asked to do is to determine whether a portion of Act 13 is constitutional or not, a judicial function. Because we are not required to make any specific legislative policy determinations in order to come to a resolution of the matters before us, the issue of whether Act 13 violates the Pennsylvania Constitution is a justiciable question for this Court to resolve.[17]

---

the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

17. The Commonwealth also raises the issue of ripeness arguing that this Court should refrain from making a determination because the answer would be based on Petitioners' assertions of speculative, hypothetical events that may or may not occur in the future. *See Pa. Power & Light Co. v. Pa. Pub. Util. Comm'n*, 43 Pa.Cmwlth. 252, 401 A.2d 1255, 1257 (1979). However, our Supreme Court

has held that "the equitable jurisdiction of this Court allows parties to raise pre-enforcement challenges to the substantive validity of laws when they would otherwise be forced to submit to the regulations and incur cost and burden that the regulations would impose or be forced to defend themselves against sanctions for non-compliance with the law. In this case, the municipalities have alleged that they will be required to modify their zoning codes, and if they fail to do so, they will be subject to penalties and/or prosecution under 58 Pa.C.S. § 3255. Therefore, the constitutionality issue is ripe for review, and declaratory judgment is the proper pro-

## III.

## FAILURE TO STATE A CLAIM

### Counts I–III

**Art. 1, § 1 of the Pennsylvania Constitution and violation of the Equal Protection Clause of the United States Constitution**

■ The Commonwealth contends that Act 13's requirement that municipal zoning ordinances be amended to include oil and gas operations in all zoning districts does not violate the principles of due process under Art. 1, § 1 of the Pennsylvania Constitution [18] and the Fourteenth Amendment of the United States Constitution [19] because they have a rational basis and constitute a proper exercise of the Commonwealth's police powers.

■ The Commonwealth states that Act 13 does not preempt local municipalities' powers to enact zoning ordinances if they are in accord with 58 Pa.C.S. §§ 3302 and 3304. Unlike 58 Pa.C.S. § 3303, which preempts all municipalities from enacting environmental laws, 58 Pa.C.S. § 3302 does keep the local municipalities' power of local zoning but only if provisions do not conflict with Chapter 32 of Act 13, which relates to oil and gas well operations and environmental concerns. 58 Pa.C.S. § 3304. 58 Pa.C.S. § 3304 mandates that all municipalities must enact zoning ordi-

nances in accordance with its provisions. This mandate, it argues "must be evaluated in light of the fundamental structural principles establishing the relationship between the Commonwealth and its municipalities. It cannot be disputed ... that the Commonwealth has established municipalities and that their power derives solely from its creator-state. 'Municipalities are creatures of the state and have no inherent powers of their own. Rather, they "possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect." ' " *Huntley & Huntley, Inc. v. Borough Council of Oakmont,* 600 Pa. 207, 220, 964 A.2d 855, 862 (2009).... To state the obvious, the MPC is a statute just like any other and as such, its zoning provisions are subject to amendment, alteration, or repeal by subsequent statutory enactment, unless such legislative act violates the Commonwealth or United States Constitutions." (Commonwealth's memorandum of law in support of preliminary objections at 24.)

While recognizing that their power to regulate zoning is only by delegation of the General Assembly, the municipalities contend that Act 13 is unconstitutional because it forces municipalities to enact zoning ordinances in conformance with 58 Pa. C.S. § 3304 allowing, among other things,

cedure to determine whether a statute violates the constitutional rights of those it affects." *Allegheny Ludlum Steel Corp. v. Pa. Pub. Util. Comm'n,* 67 Pa.Cmwlth. 400, 447 A.2d 675, 679 (1982).

18. Article 1, § 1 of the Pennsylvania Constitution provides: "All men are born equally free an independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty of acquiring, possessing and protecting property and reputation, and of pursing their own happiness."

19. Section 1 of the 14th Amendment to the United States Constitution provides: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

mining and gas operations in all zoning districts which are incompatible with the municipalities' comprehensive plans that denominates different zoning districts, making zoning irrational. Simply put, they contend that they could not constitutionally enact a zoning ordinance if they wanted to, and it does not make an ordinance any less infirm because the General Assembly required it to be passed.

### A.

■ Zoning is an extension of the concept of a public nuisance which protects property owners from activities that interfere with the use and enjoyment of their property. In *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 732–33, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995), the United States Supreme Court described the purpose of zoning as follows:

> Land-use restrictions designate "districts in which only compatible uses are allowed and incompatible uses are excluded." D. Mandelker, Land Use Law § 4.16, pp. 113–114 (3d ed.1993) (hereinafter Mandelker). These restrictions typically categorize uses as single-family

residential, multiple-family residential, commercial, or industrial. *See, e.g.,* 1 E. Ziegler, Jr., Rathkopf's The Law of Zoning and Planning § 8.01, pp. 8–2 to 8–3 (4th ed.1995); Mandelker § 1.03, p. 4; 1 E. Yokley, Zoning Law and Practice § 7–2, p. 252 (4th ed.1978).

Land use restrictions aim to prevent problems caused by the "pig in the parlor instead of the barnyard." *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). In particular, reserving land for single-family residences preserves the character of neighborhoods, securing "zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974); *see also Moore v. East Cleveland,* 431 U.S. 494, 521, 97 S.Ct. 1932, 1947, 52 L.Ed.2d 531 (1977) (Burger, C.J., dissenting) (purpose of East Cleveland's single-family zoning ordinance "is the traditional one of preserving certain areas as family residential communities").[20] *See also*

---

**20.** Ignoring that *Edmonds* was cited to explain the purpose of zoning and not the constitutional standard under the Pennsylvania Constitution, the dissent dramatically states that if no incompatible uses were permitted as part of the comprehensive plan, based on the above discussion, that would mean the end of variances and the grant of non-conforming uses. What that position ignores is that non-conforming uses were in existence before zoning and that variances are designed to ameliorate the application of the zoning ordinance to a particular parcel of property. Neither destroys the comprehensive scheme of zoning. *In Appeal of Michener,* 382 Pa. 401, 407, 115 A.2d 367, 371 (1955), our Supreme Court, quoting *Clark v. Board of Zoning Appeals,* 301 N.Y. 86, 90, 91, 92 N.E.2d 903, 904, 905 (1950), explained that in the context of why and when a variance should be granted and the importance of maintaining the general scheme of zoning stating:

'[B]efore the board may vote a variance, there must be shown, among other things, 'that the plight of the owner is due to unique circumstances and not to the general conditions in the neighborhood which may reflect the unreasonableness of the zoning ordinance itself'. The board, being an administrative and not a legislative body, may not review or amend the legislatively enacted rules as to uses, or amend the ordinance under the guise of a variance, * * * or determine that the ordinance itself is arbitrary or unreasonable * * *. If there be a hardship, which * * * is common to the whole neighborhood, the remedy is to seek a change in the zoning ordinance itself. * * * Nothing less than a showing or hardship special and peculiar to the applicant's property will empower the board to allow a variance. * * * The substance of all these holdings is that no administrative body may destroy the general scheme of a

*Cleaver v. Bd. of Adjustment*, 414 Pa. 367, 378, 200 A.2d 408, 415 (1964).

So there is not a "pig in the parlor instead of the barnyard," zoning classifications contained in the zoning ordinance are based on a process of planning with public input and hearings that implement a rational plan of development. The MPC requires that every municipality adopt a comprehensive plan which, among other things, includes a land use plan on how various areas of the community are to be used. Section 301 of the MPC, 53 P.S. § 10301. The municipality's zoning ordinance implements the comprehensive plan. Section 303 of the MPC, 53 P.S. § 10303.

A typical zoning ordinance divides the municipality into districts in each of which uniform regulations are provided for the uses of buildings and land, the height of buildings, and the area or bulk of buildings and open spaces. *See* Section 605 of the MPC, 53 P.S. § 10605. Permitted or prohibited uses of property and buildings are set forth for each zoning district, e.g., residential, commercial, and industrial. Use districts are often further sub-classified, for instance, into residential districts and then restricted to single-family houses and those in which multiple-family or apartment structures are permitted; commercial districts into central and local, or those in which light manufacturing is permitted or excluded; for heavy but non-nuisance types of industry; and nuisance or unrestricted districts. Height regulations fix the height to which buildings or portions thereof may be carried. Bulk regulations fix the amount or percentage of the lot which may be occupied by a building or its various parts, and the extent and location of open spaces, such as building set-backs, side yards and rear yards. Zoning ordinances segregate industrial districts from residential districts, and there is segrega-

zoning law by granting special exemption

tion of the noises and odors necessarily incident to the operation of industry from those sections in which the homes are located. Out of this process, a zoning ordinance implements a comprehensive zoning scheme; each piece of property pays, in the form of reasonable regulation of its use, for the protection that the plan gives to all property lying within the boundaries of the plan.

**B.**

■ To determine whether a zoning ordinance is unconstitutional under Article 1, § 1 of the Pennsylvania Constitution and Fourteenth Amendment to the United States Constitution, a substantive due process inquiry must take place. When making that inquiry, we take into consideration the rights of all property owners subject to the zoning and the public interests sought to be protected. Quoting from *Hopewell Township Board of Supervisors v. Golla*, 499 Pa. 246, 255, 452 A.2d 1337, 1341–42 (1982), our Supreme Court in *In re Realen Valley Forge Greenes Assocs.*, 576 Pa. 115, 131, 838 A.2d 718, 728 (2003), stated that:

> [t]he substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power, must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum non laedas.* 9 Coke 59—So use your own property as not to injure your neighbors. A property owner is obliged to utilize his property in a manner that will not harm others in the use of their property, and zoning ordinances may validly protect the interests of neighboring property owners from harm.

from hardships common to all.

The Court went on to state that under that standard for zoning to be constitutional, it "must be directed toward the community as a whole, concerned with the public interest generally, and justified by a *balancing* of community costs and benefits. These considerations have been summarized as requiring that *zoning be in conformance with a comprehensive plan* for growth and development of the community." *Id.* (Emphasis added).

The Commonwealth argues that Act 13 mandates that zoning regulations be rationally related to its objective: (1) optimal development of oil and gas resources in the Commonwealth consistent with the protection of the health, safety, environment and property of Pennsylvania citizens; (2) protecting the safety of personnel and facilities employed in coal mining or exploration, development, storage and production of natural gas or oil; (3) protecting the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs; and (4) protecting the natural resources, environmental rights and values secured by the Constitution of Pennsylvania. 58 Pa.C.S. § 3202.

However, the interests that justify the exercise the police power in the development of oil and gas operations and zoning are not the same. In *Huntley & Huntley, Inc.*, 600 Pa. at 222–24, 964 A.2d at 864–66, our Supreme Court explained that while governmental interests involved in oil and gas development and in land-use control at times may overlap, the core interests in these legitimate governmental functions are quite distinct. The state's interest in oil and gas development is centered primarily on the efficient production and utilization of the natural resources in the state. Zoning, on the other hand, is to foster the orderly development and use of land in a manner consistent with local demographic and environmental concerns. It then stated, as compared to the state interest in oil and gas exploration:

> [T]he purposes of zoning controls are both broader and narrower in scope. They are narrower because they ordinarily do not relate to matters of statewide concern, but pertain only to the specific attributes and developmental objectives of the locality in question. However, they are broader in terms of subject matter, as they deal with all potential land uses and generally incorporate an overall statement of community development objectives that is not limited solely to energy development. *See* 53 P.S. § 10606; *see also id.*, § 10603(b) (reflecting that, under the MPC, zoning ordinances are permitted to restrict or regulate such things as the structures built upon land and watercourses and the density of the population in different areas). *See generally* Tammy Hinshaw & Jaqualin Peterson, 7 Summ. Pa. Jur.2d Property § 24:12 ("A zoning ordinance reflects a legislative judgment as to how land within a municipality should be utilized and where the lines of demarcation between the several use zones should be drawn."). More to the point, the intent underlying the Borough's ordinance in the present case includes serving police power objectives relating to the safety and welfare of its citizens, encouraging the most appropriate use of land throughout the borough, conserving the value of property, minimizing overcrowding and traffic congestion, and providing adequate open spaces. *See* Ordinance § 205–2(A).

*Id.* at 224, 964 A.2d at 865.

In this case the reasons set forth in 58 Pa.C.S. § 3202 are sufficient to have the state exercise its police powers to promote the exploitation of oil and gas resources. This is the overarching purpose of Act 13

which becomes even more evident by 58 Pa.C.S. § 3231 which authorizes the taking of property for oil and gas operations.

58 Pa.C.S. § 3304 requires that local zoning ordinance be amended which, as *Huntley & Huntley, Inc.* states, involves a different exercise of police power. The public interest in zoning is in the development and use of land in a manner consistent with local demographic and environmental concerns. 58 Pa.C.S. § 3304 requires zoning amendments that must be normally justified on the basis that they are in accord with the comprehensive plan, not to promote oil and gas operations that are incompatible with the uses by people who have made investment decisions regarding businesses and homes on the assurance that the zoning district would be developed in accordance with comprehensive plan and would only allow compatible uses. If the Commonwealth-proffered reasons are sufficient, then the Legislature could make similar

findings requiring coal portals, tipples, washing plants, limestone and coal strip mines, steel mills, industrial chicken farms, rendering plants and fireworks plants in residential zones for a variety of police power reasons advancing those interests in their development. It would allow the proverbial "pig in the parlor instead of the barnyard." [21]

In this case, by requiring municipalities to violate their comprehensive plans for growth and development, 58 Pa. C.S § 3304 violates substantive due process because it does not protect the interests of neighboring property owners from harm, alters the character of neighborhoods and makes irrational classifications—irrational because it requires municipalities to allow all zones, drilling operations and impoundments, gas compressor stations, storage and use of explosives in all zoning districts, and applies industrial criteria to restrictions on height of structures, screening and fencing, lighting and noise.[22] Suc-

---

**21.** While I would not call oil or gas "slop," the dissent posits that this particular pig—oil and gas operations—can only operate where the "slop" is found, inferring that that allows compressor stations, impoundment dams and blasting and the storage of explosives be exempt from normal planning. However, the "slop" here is not the oil and gas but the effects of oil and gas operations on other landowners' quiet use and enjoyment of their property. The slop here—noise, light, trucks, traffic—literally affects the use of the landowner's parlor. The dissent also seems to limit the Legislature's police power to "break" local zoning to extraction industries. There may be other reasons—such as economic development that the General Assembly may want to break local zoning, such as the building of the gas extraction plant that could be used to justify almost any use in any zone under the exercise of police power. Whether you classify oil and gas operations as a "pig in the parlor" or a "rose bush in a wheat field," it nonetheless constitutes an unconstitutional "spot use."

**22.** The dissent states that the Section 3304 does not eviscerate local zoning because it does not give *carte blanche* to the oil and gas industry and does not require a municipality to convert a residential district into an industrial district. The dissent then goes on to state that "in crafting Section 3304 of Act 13, the General Assembly allowed, but restricted, oil and gas operations based on, and not in lieu of each local municipality existing comprehensive plan." 58 Pa.C.S. § 3304, it posits, shows consideration by requiring additional setbacks for the more intensive of its uses.

It is true that 58 Pa.C.S. § 3304 does not convert residential districts into industrial zones; it just requires that industrial uses be permitted in residential districts and that the zoning restrictions applicable to industrial uses be applied. It is also true that 58 Pa. C.S. § 3304 does not replace the comprehensive plan; it just supplants the comprehensive plan by allowing oil and gas operations in districts under the comprehensive plan where such a use is not allowed. Again, it is true

cinctly, 58 Pa.C.S. § 3304 is a requirement that zoning ordinances be amended in violation of the basic precept that "Land-use restrictions designate districts in which only compatible uses are allowed and incompatible uses are excluded." *City of Edmonds*, 514 U.S. at 732, 115 S.Ct. 1776 (internal quotation omitted). If a municipality cannot constitutionally include allowing oil and gas operations, it is no more constitutional just because the Commonwealth requires that it be done.[23]

Because the changes required by 58 Pa. C.S. § 3304 do not serve the police power purpose of the local zoning ordinances, relating to consistent and compatible uses in the enumerated districts of a comprehensive zoning plan, any action by the local municipality required by the provisions of Act 13 would violate substantive due process as not in furtherance of its zoning police power. Consequently, the Commonwealth's preliminary objections to Counts I, II and III are overruled.

### C.

Because 58 Pa.C.S. § 3304 requires all oil and gas operations in all zoning districts, including residential districts, as a matter of law, we hold that 58 Pa.C.S. § 3304 violates substantive due process because it allows incompatible uses in zoning districts and does not protect the interests of neighboring property owners from harm, alters the character of the neighborhood, and makes irrational classifications. Accordingly we grant Petitioners' Motion for Summary Relief, declare 58 Pa.C.S. § 3304 unconstitutional and null and void, and permanently enjoin the Commonwealth from enforcing it. Other than 58 Pa.C.S. §§ 3301 through 3303, which remain in full force and effect, the remaining provisions of Chapter 33 that enforce 58 Pa.C.S. § 3304 are similarly enjoined.

### Count IV—Art. IV, § 32 of the Pennsylvania Constitution "Special Law"

Petitioners argue that Article 3, § 32 [24] has been violated because Act 13

---

that Act 13 does provide additional consideration by requiring additional setbacks to lessen the negative effects of oil and gas operations, such as machinery noise and flood lights, on adjoining homeowners. However, the dissent fails to mention that those additional setbacks are based on industry standards regarding industrial operations, and that the added "consideration" that the operations, and the resultant light, noise, and traffic, has to be permitted 24 hours a day. None of these "considerations" would be necessary if the industrial uses included in the definition of oil and gas operations were not allowed because they are incompatible with the other uses in that district.

**23.** While there is no disagreement with the dissent's statement that a local ordinance may not frustrate the purposes and objectives of the legislature, the claim here is that the Pennsylvania Constitution stands in the way. While recognizing that "the desire to organize a municipality into zones made of compatible uses is a goal, or objective, of comprehensive planning," and that the inclusion of incompa-

tible uses might be bad planning, the dissent concludes that it does not render the ordinance unconstitutionally infirm. If that were true, then the creation of a spot zone would similarly not be unconstitutional under Article 1, § I of the Pennsylvania Constitution and the Fourteenth Amendment to the United States Constitution. Spot zoning is "[a] singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit of the owner of that lot or to his economic detriment." *Appeal of Mulac*, 418 Pa. 207, 210, 210 A.2d 275, 277 (1965). While in spot zoning the land is classified in a way that is incompatible with the classification of the surrounding land, the same unconstitutional infirmity exists here. What we have under Act 13 is a "spot use" where oil and gas uses are singled out for different treatment that is incompatible with other surrounding permitted uses. What the dissent ignores is that the sanctioning of "bad planning" renders the affected local zoning ordinances unconstitutionally irrational.

treats the oil and gas industry differently from other energy extraction and production industries by allowing the oil and gas industry to be the only industry permitted to entirely bypass the statutory baselines underlying the constitutionality of zoning and by giving them special treatment in the way they are included in all zones. To support their argument, Petitioners point to 58 Pa.C.S. § 3304 for example, which provides a time limitation on local municipalities when reviewing zoning applications. They contend, however, that all others who want to develop land in a district are required to follow the time constraints set forth in the MPC. They further argue that Act 13 creates an unconstitutional distinction between densely and sparsely populated communities because densely populated communities and their residents are afforded greater protection under Act 13 due to setback requirements.[25]

In its preliminary objections, the Commonwealth contends that Act 13 is not a "special law" in violation of Article 3, § 32 of the Pennsylvania Constitution because it is uniform in its regulation of the oil and gas industry and does not benefit or apply solely to a single group or entity or municipality. It alleges that Act 13 has not singled out one particular member of the oil and gas industry for special treatment, and Petitioners cannot show that Act 13 selects one municipality among similarly-situated political units for special treatment. The Commonwealth points out that "special laws" are only those laws which grant special privileges to an individual person, company or municipality, *see* *Wings Field Preserv. Assocs. v. Dep't of Transp.*, 776 A.2d 311 (Pa.Cmwlth.2001), and the Legislature has made a valid classification in providing for the regulation of the oil and gas industry.

Any distinction between groups must seek to promote a legitimate state interest or public value and bear a reasonable relationship to the object of the classification. *Pa. Tpk. Comm'n v. Commonwealth*, 587 Pa. 347, 363–365, 899 A.2d 1085, 1094–1095 (2006). Regarding the

24. Article 3, § 32 of the Pennsylvania Constitution provides:

**Certain local and special laws.**

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:

1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts:

2. Vacating roads, town plats, streets or alleys:

3. Locating or changing county seats, erecting new counties or changing county lines:

4. Erecting new townships or boroughs, changing township lines, borough limits or school districts:

5. Remitting fines, penalties and forfeitures, or refunding moneys legally paid into the treasury:

6. Exempting property from taxation:

7. Regulating labor, trade, mining or manufacturing:

8. Creating corporations, or amending, renewing or extending the charters thereof.

Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.

25. Petitioners also argue that there is disparity because under 58 Pa.C.S. § 3218.1, public drinking water facilities are treated differently than private water wells or other drinking sources. That section provides that "[a]fter receiving notification of a spill, the department shall, after investigating the incident, notify any public drinking water facility that could be affected by the event that the event occurred." Under this section, Petitioners allege that there is an unconstitutional distinction between public drinking water supplies and private wells in violation of equal protection principles.

mineral extraction industry, Pennsylvania courts have legitimate classifications that include classification of coal mines according to the nature of the different kinds of coal, and legislate for each class separately. *Durkin v. Kingston Coal Co.*, 171 Pa. 193, 33 A. 237 (1895); *Read v. Clearfield Co.*, 12 Pa.Super. 419 (1900); classification of open pit mining as distinguished from other mining, *Dufour v. Maize*, 358 Pa. 309, 56 A.2d 675 (1948).

In this case, while Act 13 does treat the oil and gas industry differently from other extraction industries, it is constitutional because the distinction is based on real differences that justify varied classifications for zoning purposes. While Section 3304 does violate Article 1, § 1, it does not violate Article 3, § 32. Accordingly, the Commonwealth's preliminary objection to Count IV is sustained.

**Count V—Article 1, §§ 1 and 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution Eminent Domain**

▮ In this Count, Petitioners argue that Section 3241(a) of Act 13 is unconstitutional under the United States and Pennsylvania Constitutions because it allows on behalf of a private person the taking of property for storage reservoirs and protective areas around those reservoirs.[26] 58 Pa.C.S. § 3241(a) provides, in relevant part:

(a) **General rule.** Except as provided in this subsection, *a corporation* empowered to transport, sell or store natural gas or manufactured gas in this Commonwealth *may appropriate an interest in real property* located in a storage reservoir or reservoir protective area for injection, storage and removal from storage of natural gas or manufactured gas in a stratum which is or previously has been commercially productive of natural gas.

58 Pa.C.S. § 3241(a) (emphasis added).

"Constitutions of the United States and Pennsylvania mandate that private property can only be taken to serve a public purpose. [Our Supreme Court] has maintained that, to satisfy this obligation, the public must be the primary and paramount beneficiary of the taking." *Opening Private Road for Benefit of O'Reilly*, 607 Pa. 280, 299, 5 A.3d 246, 258 (2010). Petitioners contend that no public purpose, only private gain, is served by allowing oil and gas operators to take private property for the oil and gas industry.

In its preliminary objections, among other things, the Commonwealth contends that Petitioners fail to state a claim upon which relief may be granted under Count V because they have failed to allege and there are no facts offered to demonstrate that any of their property has been or is in imminent danger of being taken, with or without just compensation. Even if they had an interest that was going to be taken, we could not hear this challenge in our original jurisdiction because the exclusive method to challenge the condemnor power to take property is the filing of preliminary objections to a declaration of taking. *See*

26. The Fifth Amendment to the Constitution of the United States provides, in relevant part, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

Article 1, § 1 of the Pennsylvania Constitution reads, "All men ... have certain inherent and indefeasible rights, among which are those ... of acquiring, possessing and protecting property...."

Article 1, § 10 of the Pennsylvania Constitution provides, in relevant part, "[N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."

26 Pa.C.S. § 306. Accordingly, the Commonwealth's preliminary objection to Count V is sustained and Count V is dismissed.

### Count VI—Art. 1, § 27 of The Pennsylvania Constitution Public Natural Resources

 Article 1, § 27 of the Pennsylvania Constitution provides:

**Natural resources and the public estate**

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. *As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.* (Emphasis added.)

Petitioners contend that Chapter 33 of Act 13 violates Article 1, § 27 of the Pennsylvania Constitution because it takes away their ability to strike a balance between oil and gas development and "the preservation of natural, scenic, historic and esthetic values of the environment by requiring a municipality to allow industrial uses in non industrial areas with little ability to protect surrounding resources and community." In its preliminary objections, the Commonwealth argues that Count VI should be dismissed as well because Article 1, § 27 explicitly imposes a duty on the Commonwealth, not on municipalities, to act as "trustee" to conserve and maintain the Commonwealth's natural resources, and, therefore, Petitioners fail to state a claim upon which relief may be granted. Even if they have an obligation, the Commonwealth contends that they do not have the power to take into consideration environmental concerns in making

zoning determinations because the Commonwealth preempts the local regulation of oil and gas operations regulated by the environmental acts pursuant to 58 Pa.C.S. § 3303.

In *Community College of Delaware County v. Fox,* 20 Pa.Cmwlth. 335, 342 A.2d 468 (1975), the sewage permit issued by the Department of Environmental Resources, predecessor of DEP, allowed a sewer authority to run a 24-inch diameter sewer along a stream. Suit was brought against the sewer authority claiming a violation of Article 1, § 27 because the issuance of the sewer permit harmed the natural resources of the Commonwealth. The sewer authority argued that the action was not maintainable because only the Commonwealth was named as a trustee of the Commonwealth natural resources in that provision. In rejecting that argument, we stated:

The language of Section 27, of course, does not specify what governmental agency or agencies may be responsible for the preservation of the natural scenic, historic and esthetic values enumerated therein, but it seems clear that many state and local governmental agencies doubtless share this responsibility. The legitimate public interest in keeping certain lands as open space obviously requires that a proper determination of the use to which land shall be adapted must be made, but again this is clearly not a statutory function of the DER. On the contrary, we believe that such a determination clearly is within the **statutory authority** not of the DER but of the various boroughs, townships, counties, and cities of the Commonwealth pursuant to a long series of legislative enactments. **Among these enactments is the Municipalities Planning Code which specifically empowers the governing bodies of these governmen-**

tal subdivisions to develop plans for land use and to zone or to regulate such uses. Another such enactment is the Eminent Domain Code under which property may be taken and its owners may be compensated when it is condemned for a proper public purpose. These municipal agencies have the responsibility to apply the Section 27 mandate as they fulfill their respective roles in the planning and regulation of land use, and they, of course, are not only agents of the Commonwealth, too, but trustees of the public natural resources as well, just as certainly as is the DER.

342 A.2d at 481–82 (emphasis added).

*College of Delaware* held that *local* agencies were subject to suit under Article 1, § 27 because of statutory obligations that they were required to consider or enforce. With regard to Petitioners' claim that Act 13 violates Article 1, § 27 because they cannot strike a balance between environmental concerns and the effects of oil and gas operations in developing their zoning ordinances, an obligation is placed on them by the MPC. It requires that all municipalities, when developing the comprehensive plan upon which all zoning ordinances are based, must "plan for the protection of natural and historic resources" but that obligation is limited "to the extent not preempted by Federal or State law." Section 301(a)(6) of the MPC, 53 P.S. § 10301(a)(6).

Act 13 is such a state law. It preempts a municipalities' obligation to plan for environmental concerns for oil and gas operations. One of the purposes given by the General Assembly in enacting Chapter 32 of Act 13, dealing with oil and gas operations, was to "[p]rotect the natural resources, environmental rights and values secured by the Constitution of Pennsylvania. 58 Pa.C.S. § 3202. In Section 3303, the General Assembly specifically stated

that all local obligation or power to deal with the environment was preempted because Chapter 32 occupied "the entire field to the exclusion of all local ordinances." 58 Pa.C.S. § 3303. By doing so, municipalities were no longer obligated, indeed were precluded, from taking into consideration environmental concerns in the administration of their zoning ordinances. Because they were relieved of their responsibilities to strike a balance between oil and gas development and environmental concerns under the MPC, Petitioners have not made out a cause of action under Article 1, § 27. Accordingly, the Commonwealth's preliminary objection to Count VI is sustained and that count is dismissed.

### Counts VII—Violation of Separation of Powers—Commission

 Under the Separation of Powers doctrine, "Neither the legislative branch nor the executive branch of government acting through an administrative agency may constitutionally infringe on this judicial prerogative." *First Judicial Dist. of Pa. v. Pennsylvania Human Relations Comm'n*, 556 Pa. 258, 262, 727 A.2d 1110, 1112 (1999). In its preliminary objections, the Commonwealth denies that 58 Pa.C.S. § 3305(a) violates the doctrine of Separation of Powers because it only confers authority on the Public Utility Commission to issue non-binding advisory opinions regarding the compliance of a local zoning ordinances with the requirements of Act 13. The Commonwealth also denies that Section 3305(b) violates the doctrine of Separation of Powers by allowing the Commission to make a determination regarding the constitutionality of a local zoning ordinance.

Petitioners disagree, arguing that 58 Pa. C.S. § 3305(a) violates the doctrine because it permits an executive agency, i.e., the Commission, to perform both legisla-

tive and judicial function. The Commission is to play an integral role in the exclusively legislative function of drafting legislation. The Commission is also to render unappealable, advisory opinions. Petitioners argue that Section 3305(b) violates the doctrine because the constitutionality of a municipal zoning ordinance as related only to oil and gas development is no longer determined in accordance with a local municipality's zoning ordinance but is determined solely by the Commission.

58 Pa.C.S. § 3305(a) provides:

(a) **Advisory opinions to municipalities.—**

(1) A municipality may, prior to the enactment of a local ordinance, in writing, request the commission to review a proposed local ordinance to issue an opinion on whether it violates the MPC, this chapter or Chapter 32 (relating to development).

(2) Within 120 days of receiving a request under paragraph (1), the commission shall, in writing, advise the municipality whether or not the local ordinance violates the MPC, this chapter or Chapter 32.

(3) An opinion under this subsection shall be advisory in nature and not subject to appeal.

58 Pa.C.S. § 3305(b) provides the following regarding "Orders":

(1) An owner or operator of an oil or gas operation, or a person residing within the geographic boundaries of a local government, who is aggrieved by the enactment or enforcement of a local ordinance may request the commission to review the local ordinance of that local government to determine whether it violates the MPC, this chapter or Chapter 32.

(2) Participation in the review by the commission shall be limited to parties specified in paragraph (1) and the municipality which enacted the local ordinance.

(3) Within 120 days of receiving a request under this subsection, the commission shall issue an order to determine whether the local ordinance violates the MPC, this chapter or Chapter 32.

(4) An order under this subsection shall be subject to de novo review by Commonwealth Court. A petition for review must be filed within 30 days of the date of service of the commission's order. The order of the commission shall be made part of the record before the court.

58 Pa.C.S. § 3305(a) does not give the Commission any authority over this Court to render opinions regarding the constitutionality of legislative enactments. 58 Pa. C.S. § 3305(a) merely allows the Commission to give a non binding advisory opinion, and although that opinion is not appealable by the municipality, no advisory opinion is. Moreover, 58 Pa.C.S. § 3305(b) specifically gives this Court *de novo* review of a Commission final *order* so there is no violation of the Separation of Power doctrine. Accordingly, the Commonwealth's preliminary objection is sustained as to Count VII.

### Count VIII—Violation of Non–Delegation Doctrine—DEP

Petitioners contend Act 13 violates Article 2, § 1 because it provides insufficient guidance to waive setback requirements established by the General Assembly for oil and gas wells from the waters of the Commonwealth. Specifically, they contend that 58 Pa. C.S. § 3215(b)(4) violates the basic principles that the legislation must contain adequate standards that will guide and restrain the exercise of the delegated administrative functions because the statutory language

fails to contain adequate standards or constrains DEP's discretion when it administers mandatory waivers from water body and wetland setbacks. Section 3215(b), regarding "Well location restrictions," provides:

(b) **Limitation.**—

(1) No well site may be prepared or well drilled within 100 feet or, in the case of an unconventional well, 300 feet from the vertical well bore or 100 feet from the edge of the well site, whichever is greater, measured horizontally from any solid blue lined stream, spring or body of water as identified on the most current 7½ minute topographic quadrangle map of the United States Geological Survey.

(2) The edge of the disturbed area associated with any unconventional well site must maintain a 100–foot setback from the edge of any solid blue lined stream, spring or body of water as identified on the most current 7½ minute topographic quadrangle map of the United States Geological Survey.

(3) No unconventional well may be drilled within 300 feet of any wetlands greater than one acre in size, and the edge of the disturbed area of any well site must maintain a 100–foot setback from the boundary of the wetlands.

(4) *The department shall waive the distance restrictions upon submission of a plan identifying additional measures, facilities or practices to be employed during well site construction, drilling and operations necessary to protect the waters of this Commonwealth.* The waiver, if granted, shall include additional terms and conditions required by the department necessary to protect the waters of this Commonwealth. Notwithstanding section 3211(e), if a waiver request has been submitted, the department may extend its permit review period for up to 15 days upon notification to the applicant of the reasons for the extension.

58 Pa.C.S. § 3215(b) (emphasis added).

Article 2, § 1 of the Pennsylvania Constitution provides that the legislative power of the Commonwealth is vested in a General Assembly consisting of a Senate and a House of Representatives. Although this article prohibits delegation of the legislative function, the Legislature may confer authority and discretion upon another body in connection with the execution of a law but that "legislation *must contain adequate standards which will guide and restrain* the exercise of the delegated administrative functions." *Eagle Envtl. II, L.P. v. Commonwealth,* 584 Pa. 494, 515, 884 A.2d 867, 880 (2005) (emphasis added) quoting *Gilligan v. Pa. Horse Racing Comm'n,* 492 Pa. 92, 94, 422 A.2d 487, 489 (1980). *See also Commonwealth of Pa. v. Parker White Metal Co.,* 512 Pa. 74, 515 A.2d 1358 (1986). Further, although the Legislature may delegate the power to determine some fact or state of things upon that the law makes or intends to make its own action depend, it cannot empower an administrative agency to create the conditions which constitute the fact. *In Re Marshall,* 363 Pa. 326, 69 A.2d 619 (1949); *Reeves v. Pa. Game Comm'n,* 136 Pa.Cmwlth. 667, 584 A.2d 1062 (1990). Basic policy choices must be made by the General Assembly. *Blackwell v. State Ethics Comm'n,* 523 Pa. 347, 567 A.2d 630 (1989).

In its preliminary objections, the Commonwealth denies that 58 Pa.C.S. § 3215(b)(4) grants DEP the power to grant waivers without establishing standards for making determinations in violation of the non-delegation doctrine under

Article 2, § 1.[27] Those standards, it contends, are contained in 58 Pa.C.S. § 3202, which provides that the General Assembly intended to "Permit optimal development of oil and gas resources of this Commonwealth consistent with protection of health, safety, environment and property of Pennsylvania citizens." 58 Pa.C.S. § 3202.

In *Pennsylvanians Against Gambling Expansion Fund v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005) (*PAGE*), our Supreme Court considered a similar defense to a constitutional challenge under Article 2, § 1 to 4 Pa.C.S. § 1506. At the

time PAGE was decided, Section 1506 provided that the siting of a gaming facility:

> shall not be prohibited or otherwise regulated by any ordinance, home rule charter provision, resolution, rule or regulation of any political subdivision or any local or State instrumentality or authority that relates to zoning or land use to the extent that the licensed facility has been approved by the board.

The Gaming Board stated that the policies and objectives listed by the Legislature in 4 Pa.C.S. § 1102[28] as well as stan-

---

**27.** Article 2, § 1 of the Pennsylvania Constitution provides that "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

**28.** 4 Pa.C.S. § 1102 provides that:

The General Assembly recognizes the following public policy purposes and declares that the following objectives of the Commonwealth are to be served by this part:

(1) The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful.

(2) The authorization of limited gaming by the installation and operation of slot machines as authorized in this part is intended to enhance live horse racing, breeding programs, entertainment and employment in this Commonwealth.

(3) The authorization of limited gaming is intended to provide a significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives.

(4) The authorization of limited gaming is intended to positively assist the Commonwealth's horse racing industry, support programs intended to foster and promote horse breeding and improve the living and working conditions of personnel who work and reside in and around the stable and backside areas of racetracks.

(5) The authorization of limited gaming is intended to provide broad economic opportunities to the citizens of this Common-

wealth and shall be implemented in such a manner as to prevent possible monopolization by establishing reasonable restrictions on the control of multiple licensed gaming facilities in this Commonwealth.

(6) The authorization of limited gaming is intended to enhance the further development of the tourism market throughout this Commonwealth, including, but not limited to, year-round recreational and tourism locations in this Commonwealth.

(7) Participation in limited gaming authorized under this part by any licensee or permittee shall be deemed a privilege, conditioned upon the proper and continued qualification of the licensee or permittee and upon the discharge of the affirmative responsibility of each licensee to provide the regulatory and investigatory authorities of the Commonwealth with assistance and information necessary to assure that the policies declared by this part are achieved.

(8) Strictly monitored and enforced control over all limited gaming authorized by this part shall be provided through regulation, licensing and appropriate enforcement actions of specified locations, persons, associations, practices, activities, licensees and permittees.

(9) Strict financial monitoring and controls shall be established and enforced by all licensees or permittees.

(10) The public interest of the citizens of this Commonwealth and the social effect of gaming shall be taken into consideration in any decision or order made pursuant to this part.

(11) It is necessary to maintain the integrity of the regulatory control and legislative

dards provided in other sections in the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101–1904, were sufficient standards for the Board to exercise its discretion with regard to zoning. Our Supreme Court rejected the Board's argument while acknowledging the "eligibility requirements and additional criteria guide the Board's discretion in determining whether to approve a licensee, we find that they do not provide adequate standards upon which the Board may rely in considering the local zoning and land use provisions for the site of the facility itself." 583 Pa. at 335, 877 A.2d at 419. It then declared 4 Pa.C.S. § 1506 to be unconstitutional and severed it from the Gaming Act.

The subsections of Section 3215(b) provide specific setbacks between the wellbore or the disturbed area of a well site and the water source. In authorizing a waiver, Section 3215(b)(4) gives no guidance to DEP that guide and constrain its discretion to decide to waive the distance requirements from water body and wetland setbacks. Moreover, it does not provide how DEP is to evaluate an operator's "plan identifying additional measures, facilities or practices to be employed ... necessary to protect the waters of this Commonwealth." 58 Pa.C.S. § 3215(b)(4).

Just as in *PAGE*, some general goals contained in other provisions are insufficient to give guidance to permit DEP to waive specific setbacks. Given the lack of guiding principles as to how DEP is to judge operator submissions, Section 3215(b)(4) delegates the authority to DEP to disregard the other subsections and allow setbacks as close to the water source it deems feasible. Because the General As-

sembly gives no guidance when the other subsections may be waived, Section 3215(b)(4) is unconstitutional because it gives DEP the power to make legislative policy judgments otherwise reserved for the General Assembly. Of course, our holding does not preclude the General Assembly's ability to cure the defects by subsequent amendment that provides sufficient standards. Accordingly, because Act 13 provides insufficient guidance to DEP as to when to grant a waiver from the setback requirements established by the Legislature, Section 3215(b)(4) is unconstitutional under Article 2, § 1. The Commonwealth's preliminary objection is overruled and summary relief is entered in favor of the Petitioners on this count.

### Counts IX & X—Unconstitutionally Vague

■■■ The Commonwealth denies that the setback, timing and permitting provisions and requirements for municipalities under Act 13 are unconstitutionally vague because they fail to provide sufficient information to inform Petitioners as to what is permitted or prohibited under the Act. Petitioners allege that the Act is vague relying on Section 3304, "Uniformity of local ordinances." They argue, for example, that under Section 3304(b), the Act mandates distance requirements for municipalities requiring that any local zoning ordinance governing oil and gas operations strictly comply with the same, but fails to provide any meaningful information or guidance with regard to when to grant a waiver or variance of the distance requirements pursuant to Sections 3215(a) and (b).

oversight over the operation of slot machines in this Commonwealth; to prevent the actual or appearance of corruption that may result from large campaign contribu-

tions; ensure the bipartisan administration of this part; and avoid actions that may erode public confidence in the system of representative government.

Both Sections 3304 and 3215 provide specific information regarding the local ordinance requirements. Section 3215 specifically provides well location restrictions and the distance within which they may be drilled from existing water wells, surface water intakes, reservoirs or other water supply extraction points. While Section 3304(b)(4) does not provide for adequate standards, Section 3304 is not unconstitutionally vague, and the Commonwealth's preliminary objections to Counts IX and X are sustained.

Accordingly, the Commonwealth's preliminary objections to Counts IV, V, VI, VII, IX, X, XI and XII are sustained. The preliminary objections to Counts I, II, III and VIII are overruled. Petitioners' request for summary relief as to Counts I, II, III and VIII is granted and these provisions are declared null and void.

The Commonwealth's cross-motion for summary relief is denied.

Judge LEAVITT did not participate in the decision in this case.

### ORDER

AND NOW, this *26th* day of *July,* 2012, the preliminary objections filed by the Commonwealth to Counts IV, V, VI, VII, IX, X, XI and XII are sustained and those Counts are dismissed. The preliminary objections to Counts I, II, III and VIII are overruled.

Petitioners' motion for summary relief as to Counts I, II, and III is granted. 58 Pa.C.S. § 3304 is declared unconstitutional, null and void. The Commonwealth is permanently enjoined from enforcing its provisions. Other than 58 Pa.C.S. § 3301 through § 3303 which remain in full force and effect, the remaining provisions of Chapter 33 that enforce 58 Pa.C.S. § 3304 are similarly enjoined.

Petitioners' motion for summary relief as to Count VIII is granted and Section 3215(b)(4) is declared null and void.

The cross-motions for summary relief filed by the Pennsylvania Public Utility Commission and Robert F. Powelson in his Official Capacity as Chairman of the Public Utility Commission and by the Department of Environmental Protection and Michael L. Krancer in his Official Capacity as Secretary of the Department of Environmental Protection are denied.

DISSENTING OPINION BY Judge BROBSON.

I agree with the majority's analysis of the standing and justiciability questions. I also agree with the majority's decision to sustain the Preliminary Objections of the Commonwealth Respondents directed to Counts IV–VII and IX–XII and dismiss those Counts of the Petition for Review. I further agree with the majority's decision to grant Petitioners' Motion for Summary Relief directed to Count VIII. I thus join in those portions of the majority opinion. I write separately, however, because I disagree with the majority's analysis and disposition of Counts I–III of the Petition for Review. I thus respectfully dissent.

The majority holds that Section 3304 of Act 13, 58 Pa.C.S. § 3304, is an affront to substantive due process because it would allow "oil and gas operations," what the majority refers to as the "pig," in zoning districts that, based on a local municipality's comprehensive plan, allow for incompatible uses—*i.e.,* residential and agricultural, to name a few. The majority refers to these incompatible zoning districts as "the parlor." Instead, the majority appears to argue that this particular pig belongs in an unidentified but different zoning district, which the majority identifies only as "the barnyard." The majority reasons that if the General Assembly can

require that municipalities allow this particular pig to be in every zoning district, it could also "require steel mills, industrial chicken farms, rendering plants and fireworks plants in residential zones." (Maj. op. at 482–84.)

The problem with the majority's analysis is that this particular pig (unlike steel mills, chicken farms, rendering plants, and fireworks plants) can only operate in the parts of this Commonwealth where its slop can be found. The natural resources of this Commonwealth exist where they are, without regard to any municipality's comprehensive plan. Oil and gas deposits can exist in a residential district just as easily as they might exist in an industrial district. What a local municipality allows, through its comprehensive plan, to be built above ground does not negate the existence and value of what lies beneath.

The General Assembly recognized this when it crafted Act 13 and, in particular, Section 3304. It decided that it was in the best interest of all Pennsylvanians to ensure the optimal and uniform development of oil and gas resources in the Commonwealth, *wherever those resources are found.* To that end, Act 13 allows for that development under certain conditions, recognizing the need to balance that development with the health, safety, environment, and property of the citizens who would be affected by the development.

Section 3304, however, does not, as the majority suggests, eviscerate local land use planning. It does not give carte blanche to the oil and gas industry to ignore local zoning ordinances and engage in oil and gas operations anywhere it wishes. Section 3304 does not require a municipality to convert a residential district into an industrial district. Indeed, in crafting Section 3304 of Act 13, the General Assembly allowed, but restricted, oil and gas operations *based on, and not in lieu of,* each *local municipality's existing comprehensive plan.*

"Oil and gas operations" is broadly defined to include different classes of activities, or "uses", related to oil and gas operations—*e.g.,* assessment/extraction, fluid impoundment, compressor stations, and processing plants. Section 3301 of Act 13, 58 Pa.C.S. § 3301. The definition reflects multiple different "uses" related to the oil and gas industry. Recognizing that some of these uses would be more intrusive than others, if not downright unsuitable for certain zoning districts, Section 3304(b) *limits* where and under what circumstance certain oil and gas operations may be allowed within a particular zoning district of a municipality.

Section 3304(b)(5), for example, provides that a local zoning ordinance must allow oil and gas operations as permitted uses in all zoning districts, but excludes from this command activities at impoundment areas, compressor stations, and processing plants. In terms of wells, Section 3304(b)(5.1) empowers local municipalities to prohibit wells within a residential district if the well cannot be located in such a way as to comply with a 500 foot setback. With respect to compressor stations, Section 3304(b)(7) provides that a municipality must allow them as a permitted use in agricultural and industrial zoning districts only. In all other zoning districts, however, they would be allowed only as conditional uses, so long as certain setback and noise level requirements can be satisfied. Act 13 does not require a municipality to allow a processing plant in a residential district. To the contrary, Section 3304(b)(8) would restrict processing plants to industrial zoning districts as a permitted use and agricultural districts as a conditional use, subject to setback and noise level requirements.

The majority cites *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995). In *City of Edmonds,* a city filed a declaratory judgment action, seeking a ruling that its single-family zoning provision did not violate the Fair Housing Act. From *City of Edmonds,* the majority excises the following sentence: "Land-use restrictions designate 'districts in which only compatible uses are allowed and incompatible uses are excluded.'" *City of Edmonds,* 514 U.S. at 732, 115 S.Ct. 1776 (quoting D. Mandelker, Land Use Law § 4.16, at 113–14 (3d ed.1993)). The words "due process" appear nowhere in the Supreme Court's opinion in *City of Edmonds.* Yet, the majority, based on this quote, reaches a legal conclusion that any zoning ordinance that allows a particular use in a district that is incompatible with the other uses in that same district is unconstitutional. I find no support for this broad legal proposition in *City of Edmonds.* Indeed, if accepted, such a rule of law would call into question, if not sound the death knell for,

zoning practices that heretofore have recognized the validity of incompatible uses— *e.g.,* the allowance of a pre-existing nonconforming use and authority of municipalities to grant a use variance.

The desire to organize a municipality into zones made up of compatible uses is a goal, or objective, of comprehensive planning. *See Huntley & Huntley, Inc. v. Borough Council of Borough of Oakmont,* 600 Pa. 207, 224, 964 A.2d 855, 865 (2009).[1] But it is not an inflexible constitutional edict. Although the inclusion of one incompatible use within a zoning district of otherwise compatible uses might be bad planning, it does not itself render the ordinance, or law, constitutionally infirm. "[A] local ordinance may not stand as an obstacle to the execution of the full purposes and objectives of the Legislature." *Id.* at 220, 964 A.2d at 863. This is exactly what the majority has done in this case by deferring to the locally-enacted comprehensive plans and zoning ordinances over the will of the General Assembly as expressed in Section 3304 of Act 13.[2]

1. In *Huntley,* the Supreme Court addressed a challenge to a local zoning ordinance that restricted oil and gas extraction in a residential zoning district. The issue before the Court was whether the Oil and Gas Act, Act of December 19, 1984, P.L. 1140, *as amended,* 58 P.S. §§ 601.101–.605 (repealed 2012) (Former Act), preempted the local ordinance. The Supreme Court held that although the Former Act preempted the field of local regulation in terms of how oil and gas resources are developed in the Commonwealth, it left room for local municipalities, through the MPC, to regulate where those resources are developed: *"[A]bsent further legislative guidance,* we conclude that the [local o]rdinance serves different purposes from those enumerated in the [Former] Act, and, hence, that its overall restriction on oil and gas wells in R–1 districts is not preempted by that enactment." *Huntley,* 600 Pa. at 225–26, 964 A.2d at 866 (emphasis added). With Act 13, which repealed the Former Act, the General Assembly has provided the courts with clear legislative

guidance on the question of whether Act 13 is intended to preempt the field of how *and where* oil and gas natural resources are developed in the Commonwealth.

2. The majority cites to our Supreme Court's decision in *In re Realen Valley Forge Greenes Associates,* 576 Pa. 115, 838 A.2d 718 (2003), in support of its claim that zoning must be in conformity with a local municipalities' comprehensive plan. A closer reading of the Supreme Court's decision in *In re Realen,* however, shows that the Court in that case was dealing with a "spot zoning" challenge, where the municipality attempted to act in contravention of its own comprehensive plan. As stated above, however, the General Assembly cannot be held hostage by each local municipality's comprehensive plan when exercising its police power. Accordingly, the restriction imposed on municipalities in *In re Realen* to comply with their comprehensive plans does not extend to the General Assembly when exercising its police power.

Section 3304 of Act 13 is, in essence, a zoning ordinance. Substantive due process cases addressed to local zoning ordinances tend to involve challenges to ordinances as *too* restrictive of the citizenry's right to use their property. Here, the challenge is that the law is too lax, in that it allows a use that Petitioners claim is appropriately restricted, if not prohibited, by local zoning ordinances. The inquiry, however, is the same, that being whether the challenged law reflects the proper exercise of the police power. If so, we must uphold it. Our Supreme Court has summarized the appropriate standard for evaluating such challenges as follows:

When presented with a challenge to a zoning ordinance, the reviewing court presumes the ordinance is valid. The burden of proving otherwise is on the challenging party.

A zoning ordinance is a valid exercise of the police power when it promotes public health, safety or welfare and its regulations are substantially related to the purpose the ordinance purports to serve. In applying that formulation, Pennsylvania courts use a substantive due process analysis which requires a reviewing court to balance the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of regulation on individual rights. The party challenging the constitutionality of certain zoning provisions must establish that they are arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare. Where their validity is debatable, the legislature's judgment must control.

*Boundary Drive Assocs. v. Shrewsbury Twp. Bd. of Supervisors,* 507 Pa. 481, 489–90, 491 A.2d 86, 90 (1985) (citations omitted). In addition, "[t]he party challenging a legislative enactment bears a heavy burden to prove that it is unconstitutional. A statute will only be declared unconstitutional if it clearly, palpably and plainly violates the constitution. Any doubts are to be resolved in favor of a finding of constitutionality." *Payne v. Commonwealth, Dep't of Corr.,* 582 Pa. 375, 383, 871 A.2d 795, 800 (2005) (citations omitted).

The stated legislative purposes of Act 13 include:

(1) [permitting] optimal development of oil and gas resources of this Commonwealth consistent with the health, safety, environment and property of Pennsylvania citizens[;]

(2) [protecting] the safety of personnel and facilities employed in coal mining or exploration, development, storage and production of natural gas or oil[;]

(3) [protecting] the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs[;] and

(4) [protecting] the natural resources, environmental rights and values secured by the Constitution of Pennsylvania.

58 Pa.C.S. § 3202. The stated purpose of Section 3304 of Act 13 is to "allow for the *reasonable* development of oil and gas resources" in the Commonwealth, consistent with the purposes of Chapter 32 of Act 13. *Id.* § 3304(a) (emphasis added).

In light of the standards set forth above, which must guide our review, Section 3304 of Act 13 is a valid exercise of the police power. The law promotes the health, safety, and welfare of all Pennsylvanians by establishing zoning guidance to local municipalities that ensures the uniform and optimal development of oil and gas resources in this Commonwealth. Its provisions strike a balance both by providing for the harvesting of those natural resources, wherever they are found, and by restricting oil and gas operations based on (a) type, (b) location, and (c) noise level. The General Assembly's decision, as re-

flected in this provision, does not appear arbitrary, unreasonable, or wholly unrelated to the stated purpose of the law.

"The line which in this field separates the legitimate from the illegitimate assumption of [police] power is not capable of precise delineation. It varies with circumstances and conditions." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 71 L.Ed. 303 (1926). There is no doubt that Petitioners have legitimate concerns and questions about the wisdom of Act 13. But it is not our role to pass upon the wisdom of a particular legislative enactment. Under these circumstances and conditions, Petitioners have failed to make out a constitutional challenge to Section 3304 of Act 13. For that reason, I would sustain the Commonwealth Respondents' preliminary objections directed to Counts I through III of the Petition for Review and deny Petitioners' Motion for Summary Relief directed to those Counts.

Judges SIMPSON and COVEY join in this dissenting opinion.